OPINION OF THE COURT
Martin Schoenfeld, J.
INTRODUCTION
The plaintiffs in this action are unleased occupants of New York City-owned in rem apartment buildings who claim that the City may not bring eviction proceedings against such occupants without first providing them with certain incidents of due process. The defendants are the City of New York (City) and the City’s Department of Housing Preservation and Development (HPD).
Essentially, plaintiffs claim that pursuant to the Fourteenth Amendment of the United States Constitution the unleased occupants may not have eviction proceedings brought against them without their first being provided with the following: (1) notice of their right to apply for tenant status and of applicable standards and procedures; (2) a determination of whether they are to be granted tenant status in accordance with written, objective standards; (3) a written statement of reasons if they are denied tenant status; and (4) a hearing to contest the denial of tenant status.
Plaintiffs now move for a preliminary injunction. For the reasons stated herein the motion is granted only to the following extent: (1) defendants are preliminarily enjoined, pending the final determination of this action, from commencing eviction proceedings against the unleased occupants of New York City-owned in rem apartment buildings without first providing the occupants with (a) notice of the occupants’ right to apply for tenant status, notice of the application procedure, and notice of specific standards to be used to make the determination; (b) an opportunity to make written submissions in support of the occupants’ application; (c) a determination made in accordance with the aforesaid procedure and standards; and (d) a written statement of reasons if the occupants are denied tenant status ([a]-[d] to include and/or be done within reasonable time periods); and (2) defendants must, within 45 days of service of notice of entry of this order, make available to plaintiffs (a) a list of the names and last-known *839 addresses or whereabouts of all present or former occupants of City-owned in rem apartments against whom eviction proceedings are currently pending, and (b) a list of the case names, with court and index number, of each such proceeding.
FACTS
Homelessness; Shelters; In Rem
New York City is in the midst of a housing crisis. The Court of Appeals has recently taken note of "the immensely difficult human, social and governmental problems presented in New York City and other large urban areas by the plight of homeless destitute families with children.” (McCain v Koch, 70 NY2d 109, 114 [1987].)
In addition to the homeless, approximately 25,000 City residents are living in temporary shelters and welfare hotels (shelters). The City has a policy of allowing shelter occupants to apply for tenancy in City-owned in rem apartment buildings (infra). Applicants are screened by HPD, and those who are denied are afforded a "full panoply of procedural safeguards,” including a statement of reasons for the denial and of their right to appeal at an on-the-record hearing with counsel and the right to cross-examine, present evidence and receive a written decision.
As of 1989, the City had acquired, through in rem tax foreclosure proceedings, title to approximately 5,000 apartment buildings containing approximately 50,000 apartments and housing approximately 130,000 leased tenants. Most of these buildings are in seriously dilapidated condition. Still, many low-income persons without leases move into vacant apartments in these buildings, in some cases impinging on the City’s attempts to rehabilitate or move shelter occupants into these apartments.
PMD; CMP; RPM; VASP; TLAU; UOP
In rem buildings are managed by HPD’s Property Management Division (PMD). Those buildings which are in poor physical condition and lack any tenant organization, including all those at issue here, are assigned to HPD’s Central Management Program (CMP) and are managed by a PMD Residential Property Manager (RPM).
On or about March 15, 1988, HPD began its Vacant Apartment Security Program (VASP), designed to prevent squatters *840 from occupying vacant in rem apartments. Apartments with squatters were referred to HPD’s Tenant Legal Affairs Unit (TLAU) for eviction proceedings. Prior to November of 1988, eviction proceedings were routinely commenced against all unauthorized occupants of CMP’s buildings. However, according to HPD, "[t]his practice was inconsistent and unpredictable and resulted in the eviction of people and families whose eviction was not good policy.”
On or about November 1, 1988, HPD first promulgated its Unauthorized Occupant Policy (UOP) "in order to gather information to evaluate identified unauthorized occupants, and to allow HPD in its discretion to authorize tenancies where appropriate.”
UOP Provisions
As set forth in UOP’s preamble, "All unauthorized occupants in residence as of April 1, 1988 are to be evaluated on a case by case basis to determine whether they would be acceptable as legal tenants. Occupants will be evaluated based on their household composition, residence history, involvement in unacceptable activities and willingness to pay rent and arrears.” Pursuant to "part i: interview,” RPMs are to make a good-faith effort to interview and complete a questionnaire concerning all unleased occupants. Pursuant to "part ii: evaluation,” an evaluation is then made by an "Area Director” to determine whether (1) there are aged, infant, pregnant or disabled persons in the household ("priority households”); (2) the household has a claim of right, i.e., someone has lived continuously in the apartment since there was a legal tenant or the time of the City’s vesting ("claim of right households”); or (3) there are "special circumstances” (such as the tenant having been offered a fake lease by a corrupt superintendent) dictating, "in fairness, equity, and the best interests of the building,” the granting of tenancy status ("special circumstance households”). After the initial evaluation by the Area Director, there is a review by the Revenue Unit, and personal review by HPD’s Deputy Director.
If a household falls within one of the three acceptable categories, is not involved in "unacceptable (i.e., illegal) activities” and is willing to pay rent and arrears, the household is referred to the Bureau of Vacant Apartment Repair and Rental (BVARR) "to be set up as legal tenants.” All other households are (1) sent a "final letter” informing them that *841 they are to be evicted and that if they have any questions they may contact HPD’s "site office,” and (2) referred to TLAU for eviction proceedings. According to HPD, "[i]n most instances,” where an occupant checks with a site office, "they will be told why they are being evicted and will be given an opportunity to provide additional evidence.” However, "if HPD or Police Department records show that the person is engaged in dangerous or illegal activities, they will [only] be told that they are a squatter and that they must vacate.” Finally, "Occupants referred to TLAU for legal action will, in most cases, be taken to court to obtain a warrant of eviction. However [if] after a review of relevant facts TLAU counsel is of the opinion that there is not a reasonable probability that a warrant of eviction can be obtained * * * the occupants will be referred to BVARR to be set up as legal tenants.”
Post-April 1,1988 Unleased Occupants
Although UOP’s preamble states that it will only be applied to "unauthorized occupants in residence as of April 1, 1988” (pre-Apr. 1, 1988 occupants), even its original transmittal letter indicates that "remaining household members” may be considered. Indeed, defendants state that "HPD will consider certain post-April 1, 1988 occupants for tenancy in limited cases of extreme hardship under the special circumstances category”. Also, plaintiffs argue that HPD’s RPMs have no reliable method of distinguishing between pre- and post-April 1, 1988 occupants.
UOP in Practice
As of April 1990, 2,230 households had been evaluated under UOP. Of these, 620 had been granted leases under the following categories: 234 were deemed priority households; 162 were deemed claim-of-right households; 114 were deemed priority and claim-of-right households; and 110 were deemed special circumstance/"other” households. Of the 1,428 households not granted leases: 230 households were deemed to have failed to cooperate and/or to have been unreachable by the RPM; 150 households were deemed "not eligible” under UOP; 540 households were deemed to have abandoned their apartments; and 508 households had already been referred to TLAU for eviction prior to UOP’s implementation.
According to plaintiffs, many households referred to TLAU have occupied their apartments for substantial periods of *842 time, often with HPD acquiescence and often with the permission of persons with apparent authority, and many such households are willing and able to pay rent and have no history of antisocial behavior. Also, according to plaintiffs, many occupants do not appear at their eviction proceedings because HPD’s notices lead them to believe that there is no basis upon which the household can remain in occupancy, whereas occupants who do appear stand a significant chance of being granted tenant status because if the TLAU attorney bringing an eviction proceeding feels that an occupant is eligible under UOP standards, the attorney often refers the occupant back to CMP for a UOP evaluation. If the attorney confirms for him/herself that an appearing occupant is ineligible, he/she proceeds with the eviction proceeding without telling the occupant or the court why the occupant was deemed ineligible, and generally these occupants are evicted or vacate (often becoming homeless).
DUE PROCESS CLAIM
Entitlement to Due Process Nature of Property Interest
The Fourteenth Amendment of the United States Constitution provides, in relevant part, that "[n]o State shall * * * deprive any person of * * * property, without due process of law”. The term "property” is not limited to real or personal property, but encompasses a broad range of what have been called "rights” or "interests.” "The Fourteenth Amendment’s procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests — property interests — may take many forms.” (Board of Regents v Roth, 408 US 564, 576 [1972].) Indeed, the "property” in which plaintiffs have an "interest” which we recognize in today’s decision is not the apartments as such which plaintiffs are occupying; rather, it is the right to be evaluated for a leasehold to the apartment.
In Goldberg v Kelly (397 US 254 [1970]), the court found that welfare recipients have a "property” interest in continued payments and, therefore, that the payments cannot be curtailed without pretermination due process. In the companion cases Board of Regents v Roth (supra), and Perry v Sindermann (408 US 593, 600, [1972]), both involving nontenured university professors’ claims to due process prior to nonre *843 newal of their employment contracts, the court provided lasting guidance as to the nature of a "property” interest entitled to due process protection.
"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment’s protection of liberty and property * * *
"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it * * *
"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.” (Board of Regents v Roth, supra, 408 US, at 569-577.)
Professor Roth was found not entitled to due process prior to nonrenewal since there was no "[ujniversity rule or policy that secured [Roth’s] interest in re-employment or that created any legitimate claim to it” (supra, at 578), while Professor Sindermann was entitled to due process prior to nonrenewal since his university had a policy of de facto tenure.
Squatters
Under New York law, "[Trespassers and squatters have] no constitutional property interest in the apartments they [occupy] * * * Nor do [they] possess a constitutional entitlement to notice and court proceedings before being arrested (or evicted). They [cannot show a] deprivation of 'rights, privileges or immunities secured by the Constitution or laws of the United States.’ ” (De Villar v City of New York, 628 F Supp 80, 83 [SD NY 1986]; see also, 272-4-8 E. 7th St. Tenants Assn. v City of New York, 117 Misc 2d 783 [Sup Ct, NY County 1982] [squatters are without standing to contest New York City’s determination to vacate an in rem building].) However, neither De Villar nor 272-4-8 involved a claim by the plaintiff squatters that the municipal defendants had a program for evaluating unleased occupants for leaseholds.
Rights vis-á-vis UOP
While squatters as such have no rights, it is this court’s *844 holding that a municipality which institutes a program to evaluate squatters for legal tenancy may not do so without observing constitutional norms. For example, in McCain v Koch (70 NY2d 109, 117-118 [1987], supra), the Court of Appeals held that a government undertaking to provide emergency housing to homeless families with children, even absent an obligation to do so, requires that such housing meet minimum habitability standards. (Cf., Matter of Fuller v Urstadt, 28 NY2d 315 [1971] [due process must be accorded to holdover subtenants of the State].)
In Amezquita v Hernandez-Colon (518 F2d 8 [1st Cir 1975]), the court held that a "State” (the Commonwealth of Puerto Rico) did not have to provide squatters with a due process hearing before evicting them from government-owned land. The court said (supra, at 13) that procedural protections "define” a property right where "the protection amounts to a substantial restriction on the ultimate [State] action being challenged.” In Amezquita (supra, at 13), "this translates to the specific question whether a prior hearing could have resulted in allowing the plaintiffs to remain on the land.” Since the plaintiffs there had no colorable claim to the land, a hearing would have been an "exercise in futility.” (Supra, at 13.) In the instant case, it is clear that a "prior hearing,” or some form of due process, may well result in the granting of leaseholds to at least some unleased occupants. Furthermore, UOP certainly "amounts to a substantial restriction on the ultimate action [here too, eviction] being challenged.”
Furthermore, UOP’s language is itself mandatory (plaintiffs claim 26 instances of mandatory language such as "must” and "will,” which begin in the preamble’s "All [pre-Apr. 1, 1988] unauthorized occupants * * * are to be evaluated * * * Occupants will be evaluated” [emphasis added]). In Hewitt v Helms (459 US 460, 471-472 [1983]), the court held that where a State goes "beyond simple procedural guidelines” and uses "language of an unmistakably mandatory character,” it creates a "protected [property] interest.”
Even if the practices embodied in UOP were an unwritten, informal "custom,” their application would trigger due process protection under Perry v Sindermann (supra). "The source of legitimate claims of entitlement is not the Constitution but rather the acts of the sovereign, state or federal, manifested in legislation, rules, or customs.” (Moore v Johnson, 582 F2d 1228, 1233 [9th Cir 1978] [entitlement not found].)
*845 In Joy v Daniels (479 F2d 1236, 1240 [4th Cir 1973]), the Fourth Circuit said as follows: "Thus we must now look to applicable statutes, governmental regulations, and the custom and understandings of public landlords in the operation of their apartments to determine if a public tenant has a 'property interest’ in a tenancy beyond the term of the lease except for cause.” The court found such a "property interest” based upon congressional policy and intent, the tenant’s expectation of some degree of permanency, and "custom”. (Accord, Lopez v Phipps Plaza S., 498 F2d 937, 943 [2d Cir 1974].)
Defendants cite Lai Chun Chan Jin v Board of Estimate (92 AD2d 218, 223 [1st Dept 1983], affd on other grounds 62 NY2d 900 [1984]) for the proposition that in order to make out a claim for denial of procedural due process, plaintiffs must be able to point to a "specific identifiable right, the loss of which resulted in computable financial damage.” We find today that plaintiffs have a "specific identifiable right” to a UOP evaluation, and that the loss of this right will — or at least may— result in computable financial damage. (Cf., Dzubey v Teachers’ Coll., 87 AD2d 783 [1st Dept 1982] [tenant entitled to an action for damages for wrongful eviction].)
Discretion
Plaintiffs claim that UOP is applied arbitrarily and that crucial housing decisions are made (1) by the scores of RPMs on an ad hoc basis in their unfettered discretion, and (2) on the basis of such unenumerated factors as which households appear at their TLAU eviction proceedings. Defendants counter (1) that UOP simply provides that if certain criteria are met, HPD will consider occupants for tenancy at its discretion, and (2) that a claimant does not have a "property interest” where a benefit is granted or denied in the discretion of an administrator. For example, in Olim v Wakinekona (461 US 238, 249 [1983]), the court said "a State creates a protected liberty interest by placing substantive limitations on official discretion. * * * If the decisionmaker is not 'required to base its decisions on objective and defined criteria,’ but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,’ * * * the State has not created a constitutionally protected liberty interest.”
However, this line of argument simply points up the horns of defendants’ dilemma: the more that review under and adherence to UOP are mandatory, the stronger is the un *846 leased occupants’ claim to a property interest; the more that review under and adherence to UOP are discretionary, the stronger is the unleased occupants’ claim that defendants have retained for themselves a constitutionally impermissible amount of arbitrary power.
For example, in Holmes v New York City Hons. Auth. (398 F2d 262, 265 [2d Cir 1968]), the Second Circuit said that due process requires that a municipal agency adopt "[a] fair and orderly procedure for allocating its scarce supply of [low-income public] housing * * * It hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse * * * For this reason alone due process requires that selections among applicants be made in accordance with 'ascertainable standards’ ” (emphasis added).
In Environmental Defense Fund v Ruckelshaus (439 F2d 584, 597-598 [DC Cir 1971] [Bazelon, Ch. J.]), the court said as follows:
"[Administrators [are required to] articulate the factors on which they base their decisions.
"Strict adherence to that requirement is especially important now that * * * courts are increasingly asked to review administrative action that touches on fundamental personal interests in life, health, and liberty. * * *
"To protect these interests from administrative arbitrariness, it is necessary, but not sufficient, to insist on strict judicial scrutiny of administrative action. * * * Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. ” (Emphasis added.) (See, Matter of Nicholas v Kahn, 47 NY2d 24, 34 [1979] ["an administrative agency is forbidden from exercising its discretionary power without first detailing standards or guides to govern the exercise of that discretion”].)
In Matter of Fuller v Urstadt (28 NY2d, supra, at 317), the issue was "whether a State agency which * * * leases apartments in a State-aided but otherwise private project in order to sublease them with rental subsidies to low-income tenants may, without explanation, refuse to renew a tenant’s sublease.” Judge Breitel answered as follows:
"Where State involvement is so dominant, it may not be arbitrary or capricious. Petitioners, subtenants, although they do not have a 'right’ to renewal of their subleases, may not be *847 denied renewal without rational cause. Consequently, they should have an opportunity to be heard in order to explain or negative the purported cause for denial. * * *
"Petitioners are entitled to the same treatment as other individuals who are the direct subjects of State action, namely, the assurance, implemented by the right to a hearing which need consist of no more than an opportunity to deny or explain, that the State has not acted arbitrarily or capriciously. ” (Supra, at 317-318; emphasis added.)
Thus defendants’ arguments are not buttressed by their claim that rather than having instituted a definite and orderly procedure, they have retained the right to, in effect, do whatever they want.
Requisites of Due Process
"[T]he two central concerns of procedural due process [are] the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process.” (Marshall v Jerrico, Inc., 446 US 238, 242 [1980].) Accordingly, "at a minimum [due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.” (Mullane v Central Hanover Trust Co., 339 US 306, 313 [1950] [Jackson, J.].) However, the courts approach cases flexibly and pragmatically, applying, essentially, a balancing of interests approach. In Holmes v New York City Hous. Auth. (398 F2d 262 [2d Cir 1968], supra), the court indicated that public housing applicants were only entitled to the due process incidents of (1) publicly disseminated admission regulations, (2) the processing of applications in a systematic manner, and (3) notice of and reasons for a denial. In the instant case, plaintiffs are already in possession of "their” apartments, and thus it would seem that a different standard would apply. (Cf., Matter of Sumpter v White Plains Hous. Auth., 29 NY2d 420, 425 [1972] ["It has long been settled that a party aggrieved by loss of a preexisting right or privilege may enjoy procedural rights not available to one denied the right or privilege in the first instance”].) However, we have held today that unleased occupants have a "property interest” in a UOP evaluation, not in the apartments they are occupying.
In Goldberg v Kelly (397 US, supra, at 262-263 [1970]), the court stated that "[t]he extent to which procedural due process *848 must be afforded the recipient is influenced by the extent to which he [or she] may be 'condemned to suffer grievous loss.’ ” In Burr v New Rochelle Mun. Hous. Auth. (479 F2d 1165, 1169 [2d Cir 1973]), the Second Circuit held that hearings were not necessary where a proposed rent increase "requirefd] * * * the evaluation of complex financial data.” However, "In a situation in which the individual rights of the tenant are directly affected [citing Goldberg] a trial type of hearing is required and the opportunity to present oral evidence serves a real function.” (Supra, at 1169; accord, Williams v Barry, 708 F2d 789, 791 [DC Cir 1983] [" 'determinations of "adjudicatory” facts * * * require hearings’ ”].) In Mathews v Eldridge (424 US 319, 335 [1976]), the court provided the following guidance: "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.”
Although a UOP evaluation is an "adjudicatory” determination, this court is not willing, on this motion for preliminary relief, to require defendants to provide a hearing as part of a UOP evaluation; plaintiffs have not shown that pursuant to a balancing of the three Mathews criteria, a hearing is required. Clearly, the "private interest” here is of a high order. However, this court cannot say at this point how much additional protection against "erroneous deprivation” a hearing would provide, over and above the requisites of due process which are being granted by today’s decision (supra). Finally, New York City is currently in a state of "fiscal desperation.” (6,000 New York City Workers Get Layoff Notices, NY Times, June 18, 1991, at 1, col 2.) Mandating a hearing for all unleased occupants prior to referral for eviction proceedings would surely entail serious "fiscal and administrative burdens,” with which we would not lightly saddle the City.
Equal Protection
The Equal Protection Clause also helps shield citizens from arbitrary governmental action. In Baxstrom v Herold (383 US *849 107, 111 [1966] [Warren, Ch. J.]), the court held that New York State could not grant the right to a jury determination of sanity to nonprisoners prior to commitment in a mental institution while denying this right to a prisoner nearing the end of his or her sentence. "[T]he State, having made [a] substantial review proceeding generally available on th[e] issue [of sanity], may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some.” (Supra, at 111.) In Cleburne v Cleburne Living Center (473 US 432, 439-440 [1985]), the Supreme Court provided a useful compendium of current equal protection law:
"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,’ which is essentially a direction that all persons similarly situated should be treated alike. * * * The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. * * *
"The general rule gives way, however, when a statute classifies by race, alienage, or natural origin. * * * [T]hese laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. * * * Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution.”
Under this analysis, "[H]ousing is not a fundamental right, and classifications affecting housing are subject only to the 'rational relationship’ test”. (Sidberry v Koch, 539 F Supp 413, 419 [SD NY 1982].)
Plaintiffs contend that defendants have violated the Equal Protection Clause by making distinctions in the treatment of the following groups of persons: (a) pre-April 1, 1988 occupants and (b) post-April 1, 1988 occupants; (a) nonoccupant applicants for in rem housing and (b) unleased occupants.
April 1, 1988 Occupancy: Defendants claim that setting an April 1, 1988 occupancy cut-off date for UOP evaluation furthers the legitimate State interest of discouraging squatting in in rem buildings. This court is not prepared to say that the goal of discouraging squatting in in rem buildings is not a legitimate State interest, or that setting a cut-off date of April 1, 1988 for UOP evaluation is not rationally related to achieving that goal.
*850 However, defendants have stated that post-April 1, 1988 occupants are considered for tenant status under the "claim of right” and "special circumstance” categories. Defendants have not advanced, nor can this court fathom, any reason why post-April 1, 1988 occupants should be denied the same consideration under the "priority” category as is afforded to pre-April 1, 1988 occupants. Thus we hold that as long as defendants continue to evaluate post-April 1, 1988 occupants for inclusion under any UOP leasehold category, they must evaluate these occupants for inclusion under all UOP leasehold categories.
Nonoccupant Status: Plaintiffs argue that unleased occupants who are made subject to eviction proceedings are denied equal protection unless they are afforded the same procedural safeguards that unsuccessful nonoccupant applicants (who are subject to the same eligibility criteria) are given. Plaintiffs contend that unleased occupants should get more, not less, protection than nonoccupant applicants, who have no possessory interest and will not be evicted if their application is denied.
Once again, defendants argue that treating unleased occupants like nonoccupant applicants would encourage squatting. We cannot dismiss this concern on the limited record before us, and we are not prepared to say that the disparate treatment here, which today’s decision will essentially reduce to the hearing granted to nonoccupant applicants, denies equal protection.
CONCLUSION
Neither the United States Constitution nor the New York State Constitution requires that "government” provide public assistance payments, subsidized housing, homeless shelters, or any of the other myriad of "benefits” currently being doled out even in the current climate of national recession and municipal desperation. However, once a "benefit” program is instituted, government may not act belter skelter, or with secret protocols, or in an arbitrarily discriminatory manner.
Defendants assert that UOP is essentially an application process. The Second Circuit recognized over 20 years ago, in Holmes (supra), that applicants for governmental benefits are entitled not just to any process but to due process. Today’s *851 holding, in our view, does no more than to recognize and give meaning and substance to this pillar of democratic government.
Accordingly, plaintiffs motion for a preliminary injunction is granted to the extent set forth above.