JACQUELINE MORILLO et al., Respondents-Appellants, and LU-CILLE ANDERSON et al., Proposed Intervenors-Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents.

First Department, March 26, 1992

## APPEARANCES OF COUNSEL

*Elizabeth Dvorkin* of counsel *(Francis F. Caputo* with her on the brief; *O. Peter Sherwood, Corporation Counsel,* attorney), for appellants-respondents.

*Sandra R. Farber* of counsel *(Karen M. Cole, Michael Kink, Patricia Gelfond, D. Stuart Meiklejohn, John E. Kirklin, David M. Cohen* and *Miriam Cardozo* with her on the brief; *Jane E. Booth, Collin D. Bull* and *Lynn M. Kelly, Marshall Green* and *Sullivan & Cromwell,* attorneys), for respondents-appellants and proposed intervenors-respondents-appellants.

## OPINION OF THE COURT

Ross, J.

The primary issue presented by this appeal is whether certain occupants of New York City owned in rem apartment buildings have any property interest in those apartments, entitling them to special procedures before the City can move to evict them.

In the spring 1990, Mr. Richard S. Heitler (Commissioner Heitler), Assistant Commissioner, Division of Property Management, Department of Housing Preservation and Development of the City of New York (City), stated, in pertinent part, in an affidavit:

"The critical need for permanent housing for the homeless in the City is brought home by the fact that at the present time, there are 9,600 single individuals and 4,300 families housed by New York's temporary shelters and welfare hotels. Together, the 9,600 singles and the 14,100 individuals in families represent 23,700 people in immediate need of permanent housing * * *

"The welfare hotels have received bad publicity for their crowded and often unsanitary conditions, lack of basic amenities for family living and exorbitantly high costs. The federal government has threatened to cut off Emergency Assistance payments to families that have resided in hotels for more than 30 days. For this and other reasons, the City has committed to relocating all the families from welfare hotels by the summer of 1990. Units rehabilitated in *in rem* housing are the bulk of the resource needed to achieve this goal".

By 1989, as a result of in rem tax foreclosure proceedings, the City had acquired title to approximately 5,000 apartment buildings, containing approximately 50,000 apartments, and housing approximately 130,000 tenants.

According to Commissioner Heitler "[t]hese [in rem] buildings are, for the most part, the worst of the City's housing stock. When title finally vests in the City, after years of neglect by private owners, physical conditions are often severely deteriorated * * * Most of these buildings usually have to have essential services, like heat, hot water, and basic plumbing restored immediately. Many buildings are partially occupied, with vacancies, fire damaged apartments, and unlocked doors, making the job of providing reasonable safety for our tenants difficult".

All in rem buildings taken by the City are managed by a unit of the City's Department of Housing Preservation and Development (HPD), known as the Property Management Division. Those buildings, which are in the worst physical condition, and lack any tenant organization whatsover are managed directly by the City in the Central Management Program (CMP), where HPD functions as owner and managing agent, and each such building is managed by a Residential Property Manager (RPM). At this time, the City claims that CMP administers approximately 32,000 apartments in approximately 3,500 in rem buildings.

When individual vacant apartments are renovated or repaired by the HPD's Bureau of Vacant Apartment Repair and Rental, they are used to provide housing to those who are homeless and currently in hotels or shelters. Since 1984, the City alleges that it has repaired 11,912 vacant apartments in occupied City-owned in rem buildings and provided them to homeless families.

Commissioner Heitler contends that:

"In the continuing effort to assert control over its buildings and to safeguard our tenants, it is drug dealers who are our greatest enemy * * *

"According to Police Department records, 2,282 arrests for possession and sale of narcotics were made in City-owned buildings in 1989. We believe that this statistic underreports the actual number of drug arrests in our buildings, to say nothing of the activity that goes on without arrests * * *

"In 1988 HPD created the Narcotics Control Unit headed by a former police detective whose job is to investigate and gain information as to the use of drugs and drug selling in City-owned buildings, to coordinate arrests of drug dealers with the Police Department and to coordinate evictions of drug dealers

from City-owned apartments with HPD's Tenant Legal Affairs Unit (TLAU) * * *

"This effort has resulted in the evictions of the former occupants of more than 1600 of our apartments. By and large the bulk of the drug dealers that we have evicted have been illegal occupants of our buildings. Of the 1600 drug-related evictions referred to above, approximately two-thirds have been either squatters or licensees * * *

"[T]he drug problem remains one of our worst and most dangerous problems in the management of our housing stock".

Due to the fact that HPD was losing over 60 vacant in rem apartments a month to illegal occupants, such as squatters, on March 15, 1988, it instituted the Vacant Apartment Security Program (VASP), requiring RPMs of in rem buildings to regularly visit such apartments, protect them with locks, and, if squatters were found, to immediately report their presence to HPD's Tenant Legal Affairs Unit to commence eviction proceedings.

After the initiation of VASP, HPD decided that it would no longer routinely seek the eviction of all squatters, since that "practice was inconsistent and unpredictable and resulted in the eviction of people and families whose eviction was not good public policy", and therefore, on or about November 1, 1988, the City promulgated the Unauthorized Occupant Policy (UOP), which had been developed, "in order to gather information to evaluate identified unauthorized occupants, and to allow HPD in its discretion to authorize tenancies where appropriate".

Our examination of the provisions of the UOP indicates that it contains a preamble, which states, in pertinent part that, "[a]ll unauthorized occupants in residence as of April 1, 1988 are to be evaluated on a case by case basis to determine whether they would be acceptable as legal tenants. Occupants will be evaluated based on their household composition, residence history, involvement in unacceptable activities and willingness to pay rent and arrears".

Under the UOP each RPM is required to make a good-faith effort to interview all unauthorized occupants in his or her building and then complete a questionnaire.

Further, the UOP establishes three categories of households. First, "priority households", which include senior citizens, mentally or physically handicapped individuals, pregnant women, or children under the age of 18. Second, "claim of

right households", which include a member whose residency relates back to a legal tenant. Third, "special circumstances households", encompassing a broad group of persons, which equity favors allowing them to become legal tenants.

If a household falls within one of the three designated types of households, is "not involved in unacceptable activities and [is] willing to pay rent and arrears [it] will be referred to the Bureau of Vacant Apartment Repair and Rental (BVARR) to be set up as legal tenants". The UOP states that "[e]xamples of unacceptable activity include, but are not limited to, drug trafficking, prostitution, organized gambling, attacking or threatening other residents of the building, damaging or defacing any portion of the building, generating excessive traffic of people and/or materials in and out of the building, and generating loud noise which is disturbing to other residents".

The cutoff date for UOP evaluation is April 1, 1988. Accordingly, UOP is not applicable to illegal occupants who began living in their apartments after April 1, 1988. In other words, post-April 1, 1988 occupants are subject to HPD's preexisting policy of referring all illegal occupants for eviction, except in extraordinary circumstances.

As of April 1990, HPD had reviewed 2,230 unauthorized occupants and had offered leases to 620 households.

Five unauthorized occupants (plaintiffs) of City-owned in rem buildings commenced the instant action against the City, HPD, and the Commissioner of HPD (defendants), alleging that UOP violates the Due Process and Equal Protection Clauses of the New York State and the United States Constitutions. Further, plaintiffs, as well as proposed plaintiffs-intervenors, moved for intervention, class certification, and a preliminary injunction, barring any evictions unless the unauthorized occupants were given notice, a hearing and a statement of reasons regarding why they were not offered leases. In response, defendants cross-moved to dismiss the complaint for failure to state a cause of action.

By order entered July 12, 1991, the IAS court, *inter alia,* denied the cross motion of defendants, denied the motions for intervention, denied the motion for class certification, and granted a preliminary injunction, which barred defendant HPD from bringing new eviction cases unless HPD provided occupants with notice of the right to apply for a lease, the procedure for application and the standards applications are

decided by, and occupants had the opportunity to provide information in writing in support of the application and HPD made its determination in accordance with the standards and provided a written statement of reasons for denials. Defendants appeal, and plaintiffs, as well as proposed plaintiffs-intervenors, cross-appeal.

Thereafter, by order entered August 19, 1991, this court granted the motion of the plaintiffs and proposed plaintiffs-intervenors to vacate defendants' stay of the order of the IAS court, entered July 12, 1991, to the extent of issuing a preliminary appellate injunction enjoining defendant HPD from issuing or executing warrants of eviction on any pending or nonpending cases, and further staying HPD from proceeding against or evicting any unleased occupants by summary eviction proceedings in the Housing Court, pending hearing and determination of the appeal and cross appeal.

In *LaRossa, Axenfeld & Mitchell v Abrams* (62 NY2d 583, 588 [1984]), the Court of Appeals stated "that due process is a flexible constitutional concept calling for such procedural protections as a particular situation may demand. *(Morrissey v Brewer,* 408 US 471, 481; *Health Ins. Assn. v Harnett,* 44 NY2d 302, 309.) * * * Accordingly, it has long been recognized that consideration of issues of procedural due process requires an evaluation of the interests of the parties to the dispute, the adequacy of the contested procedures to protect those interests and the government's stake in the outcome. *(Mathews v Eldridge,* 424 US 319, 334-335 * * *)".

It is well-settled law that property interests are created by State law *(Board of Regents v Roth,* 408 US 564, 577 [1972]; *Matter of Economico v Village of Pelham,* 50 NY2d 120, 125 [1980]). Significantly, the United States Supreme Court held, in *Board of Regents v Roth (supra,* at 577): "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits". And further, the United States Supreme Court in *Board of Regents v Roth (supra,* at 577) held that if a person has no "legitimate claim of entitlement" to the property affected by a governmental decision, the Due Process Clause is not implicated.

We agree with the IAS court that it is clear that under

New York law, a mere squatter *as such* has no property interest in the real property being occupied or in continual occupancy *(Morillo v City of New York,* 151 Misc 2d 837, 843).

Although UOP sets forth guidelines for HPD staff to use in their evaluation of unauthorized occupants of in rem apartments in determining if such persons should be offered leases, those guidelines, in and of themselves, do not create a property right to an apartment, since "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *(Olim v Wakinekona,* 461 US 238, 250 [1983].) To put it another way "[t]o have a property interest protected by the Constitution, one must have more than a unilateral expectation; he [or she] must have a legitimate claim of entitlement to something" *(Matter of Language Dev. Program v Ambach,* 96 AD2d 667, 668 [1983], *appeal dismissed* 60 NY2d 859 [1983]).

A procedure to obtain an apartment does not create any due process property right, if an administrative agency, such as HPD, has broad discretion in granting or denying the apartment *(Matter of Doe v Coughlin,* 71 NY2d 48, 55 [1987], *cert denied* 488 US 879 [1988]).

In *Matter of Doe v Coughlin (supra,* at 55), the Court of Appeals stated, in pertinent part: "It is the [person's] legitimate expectation of the benefit which creates the protected constitutional interest, however, not the possibility that a benefit may be received. Thus, the structure of the decision-making process is at least as important as the likely result of the process. If access to a program is based upon objective criteria, individuals satisfying such criteria may possess a legitimate expectancy worthy of constitutional protection. When access to such programs is contingent upon subjective factors no such expectancy is warranted and no constitutional right arises".

Based upon our examination of UOP, since we find that HPD's evaluation of which unauthorized occupants would make acceptable tenants is "contingent upon subjective factors", we further find that "no constitutional right arises" *(Matter of Doe v Coughlin, supra,* at 55). An example of HPD's broad discretion is found in the UOP, wherein it is stated that "unacceptable activity" by tenants "is not limited to" the specific instructions given. Property interests are created by State law *(Board of Regents v Roth, supra; Matter of Econom-*

*ico v Village of Pelham, supra).* It is old and well-established law that a squatter has no property interest in a continued occupancy *(see, Williams v Alt,* 226 NY 283 [1919]).

Here UOP created a procedure whereby they could determine whether squatters would be considered for leases to the space they unilaterally occupied. This procedure does not create any substantive rights. It is merely a humanitarian effort to assist certain persons, such as homeless families, from enduring further hardships.

Further, UOP made its program applicable only to those who entered into possession prior to April 1, 1988. Accordingly, those who entered into possession subsequent to that date could not have any entitlement to possession.

In summary, we find that, based upon our analysis *supra,* the IAS court erred in denying defendants' cross motion to dismiss.

We have considered the other contentions of the parties, and find them to be without merit.

Accordingly, the order of the Supreme Court, New York County (Martin Schoenfeld, J.), entered on or about July 12, 1991, which, *inter alia,* granted a motion by plaintiffs, pursuant to CPLR 6301 and 6311 for preliminary injunctive relief, denied the cross motion of defendants, pursuant to CPLR 3211 (a) (7), to dismiss the complaint, and denied the motion of the proposed plaintiffs-intervenors, pursuant to CPLR 1013, for leave to intervene, is modified, on the law and on the facts, to the extent of denying the motion of plaintiffs for preliminary injunctive relief, vacating the preliminary injunction, granting the cross motion of defendants to dismiss the complaint; the complaint is dismissed, and the order is otherwise affirmed, without costs.

CARRO, J. P. (dissenting). In this action by unleased occupants of New York City-owned in rem buildings to compel defendants to evaluate plaintiffs and those similarly situated for legal tenancies pursuant to New York City's Unauthorized Occupant Policy (UOP), the proposed intervenors should have been granted leave to intervene, since it has been shown that each of them has a real and substantial interest in the outcome of the litigation *(see, Plantech Hous. v Conlan,* 74 AD2d 920, *appeal dismissed* 51 NY2d 862). In partially denying plaintiffs' claims under the Equal Protection Clauses of the United States and New York State Constitutions, the court noted that all evaluations under the UOP must take

place before any eviction process may begin. Accordingly, and in light of the defendants' assertion on appeal that they interpret the order to permit the continuation of all eviction proceedings commenced prior to this litigation, the preliminary injunction should be expanded to enjoin those eviction proceedings commenced after the promulgation of the UOP, regardless of whether they were instituted prior to the commencement of this litigation. This additional injunctive relief is necessary to maintain the status quo *(see, Golfinos v 400 Coop. Corp.,* 110 AD2d 522).

The IAS court correctly granted plaintiffs a preliminary injunction upon an appropriate showing of a likelihood of success on the merits, irreparable injury were the injunction not granted, and a balance of the equities in their favor *(see, Rockland Dev. Assocs. v Village of Hillburn,* 172 AD2d 978). Plaintiffs were not obliged to show a certainty of success on the merits *(Parkmed Co. v Pro-Life Counselling,* 91 AD2d 551). The risk of being rendered homeless is a risk of suffering an irreparable injury *(McCain v Koch,* 117 AD2d 198, 211, *revd on other grounds* 70 NY2d 109). Given the scope of the preliminary injunction, and considering that irreparable harm has been shown, the alleged delay in the City's provision of in rem apartments to present shelter residents that may result from this injunction is not sufficient to tip the balance of equities in the City's favor *(cf., Town of Porter v Chem-Trol Pollution Servs.,* 60 AD2d 987).

The IAS court correctly determined that plaintiffs showed a likelihood of success on their claim that defendants' refusal to provide them and those similarly situated with a full evaluation under the UOP prior to the commencement of eviction proceedings violates their right to due process. While plaintiffs concede that they have no right to continued occupancy of in rem apartments as such, and although there is ordinarily no due process right to participate in an application process unless there is some property right to be expected at the end of that process *(Mehta v Surles,* 720 F Supp 324, 335, *affd in relevant part* 905 F2d 595), substantive limits on City officials' discretion within the application process may create a property interest in the application procedure *(Spano v McAvoy,* 589 F Supp 423, 428). Even informal rules can create the requisite property interest if there is such a legitimate expectation *(see, Bykofsky v Hess,* 107 AD2d 779, 781, *affd* 65 NY2d 730, *cert denied* 474 US 995). The key is whether or not the process does more than establish mere procedural require-

ments *(BAM Historic Dist. Assn. v Koch,* 723 F2d 233, 236-237).

Here, under the UOP, all unauthorized occupants must be evaluated to determine whether they qualify for priority, claim of right, or special circumstances status, and all such households will be given a legal lease unless they meet certain negative criteria, characterized under the umbrella of "unacceptable activity." Due process rights obtain because there are consequences attached to particular circumstances, and because explicitly mandatory language establishes specified substantive predicates to limit discretion under the UOP *(see, Wallace v Robinson,* 940 F2d 243, 246-247).

Although the IAS court recognized that the discouraging of unauthorized entry into in rem apartments is a legitimate governmental interest, the record supports the court's preliminary conclusion that, while occupants who took entry of their apartments after a cutoff date established in the UOP may not be considered for priority household status, they are considered for claim of right and special circumstances household status. Accordingly, the relationship between the stated municipal goal and the distinction between those postcutoff applicants seeking priority status and those seeking either of the other two statuses is so attenuated as to render the distinction arbitrary or irrational *(see, Cleburne v Cleburne Living Center,* 473 US 432, 446). Accordingly, to the limited extent that the IAS court found that plaintiffs are likely to prevail in their claim of violation of the Equal Protection Clauses of the Federal and State Constitutions, that finding is supported by the record. The record also supports the IAS court's conclusion that the remaining distinctions emphasized by plaintiffs are rationally related to a legitimate governmental interest, even though one class of needy persons is denied public assistance that is potentially available to others *(see, Matter of Lee v Smith,* 43 NY2d 453, 460).

Accordingly, the order of the Supreme Court, New York County (Martin Schoenfeld, J.), entered on or about July 12, 1991, which, *inter alia,* granted plaintiffs' motion pursuant to CPLR 6301 and 6311 for a preliminary injunction, denied defendants' cross motion pursuant to CPLR 3211 (a) (7) for dismissal of the complaint, and denied the proposed intervenors' motion pursuant to CPLR 1013 for an order permitting their intervention as plaintiffs, should be modified to grant the motion for leave to intervene and to expand the preliminary injunction so as to enjoin the continuation or commencement

of any eviction proceedings against any unleased occupant of a City-owned in rem building commenced after the promulgation of the 1988 Unauthorized Occupant Policy of the New York City Department of Housing Preservation and Development, and otherwise affirmed. Seven orders of the same court, entered on July 17, 1991, and two orders of the same court, entered on July 22, 1991, all of which denied motions to intervene by the proposed intervenors, should be reversed, and the motions for leave to intervene granted.

ROSENBERGER, WALLACH and ASCH, JJ., concur with ROSS, J.; CARRO, J. P., dissents in a separate opinion.

Order of the Supreme Court, New York County, entered on or about July 12, 1991, is modified, on the law and on the facts, to the extent of denying the motion of plaintiffs for preliminary injunctive relief, vacating the preliminary injunction, and granting the cross motion of defendants to dismiss the complaint; the complaint is dismissed, and the order is otherwise affirmed, without costs.