Rose Mary **WALLS, Juana Doe, Juan Garcia, Pasram Goberdhan, Juan Doe, and John Roe, as Individuals and on Behalf of All Those Similarly Situated, Plaintiffs,**

v.

**Rudolph GIULIANI, as Mayor of the City of New York and Deborah Wright, as Commissioner of Housing Preservation and Development, Defendants.**

No. 95 CV 2494.

United States District Court, E.D. New York.

Feb. 8, 1996.

216

Paul A. Crotty, Corporation Counsel of the City of New York, New York City (Nancy Hirschmann, Lawrence S. Kahn, Terryl Sellers, Daniel J. Struck, of counsel), for defendants.

Michael E. Deutch, Center for Constitutional Rights, New York City (Arthur Kinoy, Raymond H. Brescia, of counsel), Martin Needleman, Brooklyn Legal Services Corp., Brooklyn, N.Y. (Paul J. Acinapura, Richard J. Wagner, of counsel), Renee Steinhagen, Public Interest Law Center at Rutgers, Newark, New Jersey, for plaintiffs.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

This is one of several recent cases involving squatters who are occupying apartments in buildings acquired by the City of New York in tax foreclosure proceedings. Lord Denning has succinctly defined a squatter as "one who, without any colour of right, enters on an unoccupied house or land, intending to stay there as long as he can. He may seek to justify or excuse his conduct. He may say he was homeless and that this house or land was standing empty. But this plea is of no avail in law." *McPhail v. Persons Unknown,* 1 Ch. 447, 456B (1973) (Denning, J.).

"Although urban residential squatting is probably as old as history," it became "a problem of serious social concern" in England and the United States in the late 1960s and 1970s. Jesse Dukeminier & James E. Krier, Property 106–07 (2d ed. 1988). Under English law, the remedy of self-help is available to an owner of property occupied by squatters. This remedy derives from the fact that the squatters illegally entered the property of the owner. *Id.* "They were trespassers so long as they remained there. So the trespassers never gained possession. The owner, being entitled to possession, was entitled to forcibly turn them out." *McPhail,* 1 Ch. at 456B. In reaching this conclusion, Lord Denning relied upon Sir Frederick Pollock's statement of the prevailing law:

A trespasser may in any case be turned off land before he has gained possession, and he does not gain possession until there has been something like acquiescence in the physical fact of his occupation on the part of the rightful owner.

Pollock on Torts 292 (15th ed. 1951) (1887).

The present case involves residential squatters who, notwithstanding a string of legal setbacks suffered by others, seek to prevent the City of New York from employing the remedy of self-help to remove them from City-owned dwellings. The new wrinkle in this case is plaintiffs' allegation that, for its own economic reasons, the City of New York deliberately adopted a policy of encouraging squatters to occupy City-owned buildings and that it deliberately acquiesced in their occupancy of the property. Plaintiffs argue that the prior acquiescence of the City of New York in their otherwise illegal occupation creates an interest sufficient to entitle them "due process" before they are forcibly removed. Specifically, the complaint alleges:

There has existed for more than fifteen (15) years within the City of New York a growing homelessness crisis which largely affects low-income and minority families who are unable to locate affordable rental apartments.

. . . .

Upon information and belief, during the past fifteen years, the costs to defendants of providing temporary shelter to the increasing number of homeless families and individuals has risen dramatically.

Upon information and belief, the present cost of housing one homeless family in a Tier Two Family shelter exceeds $40,-000.00 per year, and the average period of time a family remains in said shelter is approximately fourteen (14) months.

*Upon information and belief, for more than ten (10) years the defendants, in an effort to control and limit the costs of providing such temporary shelter to said homeless population, have knowingly tolerated and acquiesced in the use of their vacant and partially occupied in rem properties by homeless families for residential purposes.*

*Upon information and belief, it has been a part of the defendants' policy to tolerate and acquiesce in such use and occupancy, and to simply "look the other way" until such time as defendants may wish to oust such occupants in order to use said premises for other purposes.*

Amended Complaint ¶¶ 49, 53–56 (emphasis supplied).

While New York law permits self-help and does not confer any property interest on squatters, the policy of acquiescence alleged in the amended complaint, if proved, may be sufficient to create the kind of "naked possessory interest," known as a tenancy at sufferance, *Livingston v. Tanner*, 14 N.Y. 64, 66 (1836), for which New York law and the Constitution provide some notice before resort is had to self-help. Accordingly, although many of the grounds for relief suggested by plaintiffs are without merit and have been rejected elsewhere, I deny defendants' motion to dismiss the complaint which was filed as a class action.[1] I deny plaintiffs' cross-motion for a preliminary injunction, however, because they have failed to make the showing necessary to obtain such relief.

## DISCUSSION

The effect of acquiescence by an owner in a squatter's occupation of property is directly addressed in a related line of cases construing Forcible Entry and Detainer ("FED") statutes. These statutes provide a remedy for occupants who are forcibly removed from real property. New York Real Property Law § 853, which is an example of such a statute, reads as follows:

> If a person is disseized, ejected, or put out of real property in a forcible manner ... he is entitled to recover treble damages in an action therefor against the wrongdoer.

N.Y.Real Prop.Acts.Law § 853.

Notwithstanding the facially broad language of those FED statutes, they have been held to provide no protection for trespassers *unless* the owner of the property acquiesced in its occupation. "[I]f the party in possession submits and allows a trespasser to remain quietly in possession for a considerable time, he cannot afterward take the law into his own hands and repel the intruder by force, because, under such circumstances, the possession, although wrongful and at first maintained by menace and violence, will have ripened into a peaceable possession for a disturbance of which forcible entry and detainer would be the appropriate remedy." 35 Am.Jur.2d, Forcible Entry and Detainer § 17, at 902 (1967).

Dean Prosser makes the same point. Citing cases from various jurisdictions, he observes that "[a] trespasser who ousts the owner acquires no such possession as will entitle him to protection against an immediate forcible reentry.... What is required is 'something like acquiescence in the physical fact of his occupation on the part of the rightful owner.'" William L. Prosser, The Law of Torts § 23, at 124 (4th ed. 1971). Dean Prosser, however, adds the following significant caveat:

> Mere delay in taking effective action, even for a period of months, will not make the entry [of the owner] tortious, where the owner has not discovered his dispossession, or has made persistent efforts to enter, but acquiescence or toleration of the wrongful possession, even for a day, may bring him within the statute.

*Id.* The cases which underlie this hornbook law recognize the principle that acquiescence may transform an illegal trespassory occupancy into some kind of a possessory interest.

■ New York's intricate statutory scheme for allowing owners to recover possession of their property is predicated on the same principle. New York Real Property Actions and Proceedings Law § 713, which makes available the option of a summary judicial proceeding in those instances in which a landlord may resort to self-help, is available against a squatter only where "[the squatter] or the person to whom he has succeeded has intruded into or squatted upon the property without the permission of the person entitled to possession and the occupancy has continued without permission or permission has been revoked and notice of the revocation given to the person to be removed." N.Y.Real Prop.Acts.Law § 713(3). Because the purpose of this statute is to encourage resort to judicial process in lieu of self-help, *see Velazquez v. Thompson*, 451 F.2d 202, 204 (2d Cir.1971), it clearly reflects the premise that self-help is not available when a landlord gives a squatter permission, whether implicit or express, to occupy his property.

---

**1.** The six individual plaintiffs have not formally moved for class certification.

■ If acquiescence may transform a trespass into a possessory interest of some kind, the problem then becomes defining the nature of that interest. Plaintiffs argue that they are at least tenants by sufferance who are entitled to a thirty-day notice to quit before they can be removed from the apartments they occupy. Specifically, plaintiffs rely on New York Real Property Law § 228, which provides that "[a] tenancy at will or by sufferance, however created, may be terminated by a written notice of not less than thirty days given in behalf of the landlord, to the tenant, requiring him to remove from the premises," and that only "after the expiration of thirty days after the service of such notice, [may the landlord reenter], maintain an action to recover possession, or proceed in the manner prescribed by law, to remove the tenant...." *Id.*

Resort to the common law definition of a tenant by sufferance provides support for plaintiffs' claim that, if the allegations in the complaint are true, they may be sufficient to confer on squatters the status of tenants by sufferance. "[A]t common law a tenant in sufferance was not entitled to a notice to quit. He was regarded as holding over by wrong, after the determination of his interest, having no estate, but a naked possession only, and standing in no privity to the landlord." *Livingston v. Tanner,* 14 N.Y. 64, 66 (1836). The tenant by sufferance "was not liable for rent, because it was folly of the owner to suffer him to continue in possession after the determination of the proceeding estate ... but the owner could enter upon the tenant at sufferance and dispossess him by force ... and thus determine the tenancy, and the tenant could have no remedy by action." *Id.*

■ The possessory interest created by the defendants' alleged acquiescence in the occupation of its real property by squatters is closely akin to the "naked possession" that characterized a tenancy by sufferance at common law. Like a tenancy by sufferance, a squatter's possession is "a wrongful holding" of the property which is made possible "by the folly of the owner to suffer him to continue in possession." While normally such tenancies arise after the termination of

what was initially a lawful interest, that is not the critical aspect of a tenancy by sufferance. Instead, it is the acquiescence of the owner in the "wrongful holding" by the tenant.

The relationship of the parties, prior to the period of sufferance, is significant only because it may shed some light on the kind of relationship that the landlord is "suffering." If the prior relationship was a tenancy of some kind, then it may be inferred that a tenancy by sufferance continues thereafter. The absence of a prior relationship, however, may make it more difficult to draw such an inference. This deficiency, however, does not compel the conclusion that plaintiffs will be unable to establish conduct sufficient to create a tenancy by sufferance if the allegations in the complaint are proved at trial.

The initial trespassory nature of plaintiffs' entry would not preclude it from being transformed into a tenancy by sufferance or some higher form of tenancy with the acquiescence of the owner. *See Tunick v. Federal Food Stores, Inc.,* 117 Misc. 329, 331, 191 N.Y.S. 174 (2d Dep't 1921) (holding that a landlord's acceptance of rent turned a trespasser to a tenant at sufferance). On the contrary, the conclusion that the conduct of a landlord may convert a trespasser's occupancy into a tenancy by sufferance is not only consistent with the critical elements of the common law tenancy by sufferance, it is also consistent with N.Y.Real Prop.Law § 228, which requires thirty days notice to quit for a tenancy at sufferance, "however created." Moreover, if the initial entry of a squatter took place after the City adopted the alleged policy of acquiescence and toleration, it may not be accurate to describe the entry as unlawful.

The fact that the allegations in the complaint may be sufficient to create a tenancy by sufferance does not end the discussion. This is an action pursuant to 42 U.S.C. § 1983, in which plaintiffs must establish a violation of the Constitution. The principal issue here is whether the thirty-day notice to quit afforded by N.Y.Real Prop.Law § 228 is sufficient to create a property interest protected by the Due Process Clause. In a characteristically thoughtful opinion, in which he rejected due process claims similar to

those raised by plaintiffs here, Judge Leval observed that, "[a]lthough the Constitution has been much trivialized, it has not progressed to the point where every notice provision of state property law has become a matter of constitutional right." *De Villar v. City of New York*, 628 F.Supp. 80, 84 (S.D.N.Y.1986) (citation omitted).

■ "The important question in determining whether procedural protections define a property right is whether the protection amounts to a substantive restriction on the ultimate action being challenged." *Amezquita v. Hernandez–Colon*, 518 F.2d 8, 13 (1st Cir.1975). The procedural provision at issue in *De Villar* was N.Y.Real Prop.Acts.Law § 713(3), which is part of an optional summary eviction scheme and which provides that "a court will not issue a judgment of eviction without ten days notice." Judge Leval correctly concluded that this provision "in no way implies that an owner is barred by law from removing a trespasser or illegal occupant." *De Villar*, 628 F.Supp. at 84. Unlike the optional notice provision that Judge Leval addressed in *De Villar*, the mandatory thirty-day notice to quit in this case constitutes a significant restriction on the right of the landlord to occupy his property and confers a significant substantive benefit on the occupant by affording her the right to occupy the premises for thirty days during which she can seek alternative housing.

■ Similar conditions are considered substantive restrictions on behavior that can serve as consideration under contract law. A provision, either written into a contract or imposed by law, requiring prior notice before a party withdraws from a contract terminable at will, is sufficient to save a contract from a claim of invalidity due to lack of consideration. The detriment to the party required to provide such notice and the benefit to the party entitled to receive it are deemed to constitute sufficient consideration to hold to each party to the terms of the agreement until it is properly terminated. 3 Richard A. Lord, Williston on Contracts § 7:13, at 270–82 (4th ed. 1992). Until the requisite notice is given, the party desiring to terminate the contract must continue to perform or face liability for damages for breach of contract.

Although the analogy may be imperfect, the thirty-day notice to quit provision accomplishes the same result as a notice of termination clause in a contract terminable at will. It effectively limits the right of the landlord to terminate the implied contract that a tenancy by sufferance reflects and confers a right on the tenant to the continued occupation of the property for a period of thirty days. This is sufficient to create a property right protected by the Due Process Clause. Because this right is essentially a hybrid between a procedural and a substantive right, the Due Process Clause requires that the thirty days notice to quit must be provided unless other provisions of New York law provide a basis for dispensing with it.

Plaintiffs' attempts to place additional procedural limitations on the ability of the City to use self-help must fail. Even if New York law precluded the use of self-help by requiring a judicial proceeding to remove a tenant by sufferance, a self-help eviction would not violate the Due Process Clause. Unlike the notice requirement which confers a right on the occupant to remain in possession for thirty days, the purpose of requiring a judicial proceeding is to avoid a resort to self-help. *See Velazquez v. Thompson*, 451 F.2d 202, 204 (2d Cir.1971). Because New York does not place any substantive restrictions on termination of this interest, plaintiffs are not entitled to a hearing. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *see also West Farms Assocs. v. State Traffic Comm'n*, 951 F.2d 469, 472 (2d Cir.1991) (Due Process Clause does not protect against deprivation of state procedural rights), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).

■ The Due Process Clause is not the only provision of the Constitution that may be implicated here. The manner in which self-help evictions are allegedly effectuated also implicates the Fourth Amendment right to be free from unreasonable searches and seizures. The "physical entry of the home is the chief evil against which the wording of

the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (citations omitted). While the Fourth Amendment does not protect the right of a person to make his home in someone else's house, it may limit the manner in which a self-help eviction by the City may be undertaken here.

The allegations of the amended complaint, which are assumed to be true, graphically describe the manner in which the self-help evictions are accomplished:

> To effectuate the ouster of those who are similarly situated to members of the class, the defendants have utilized the following tactics: 1) breaking down doors to their apartments; 2) sealing doors and changing the locks thereof after the ouster of such persons and their families; 3) using weapons and police dogs to intimidate and terrorize such persons and their families into immediately abandoning their homes and belongings; 4) making shows of overwhelming force by appearing at the subject premises with a multitude of police and threatening to arrest such persons and their families on unspecified charges unless they immediately vacate their homes; 5) affording such persons and their families as little as fifteen (15) minutes to gather up such belongings as they can carry before being forced to vacate their homes; and 6) leaving such persons' remaining personal property in the building under seal or removing said property to warehouses or other storage facilities, thus depriving class members of access to and use and enjoyment of said property.
>
> . . . .
>
> [I]f defendants arrive at an apartment targeted for a self-help eviction and discover that no one is at home, it is their practice to change the locks and bar the occupants' re-entry into the apartment. A variation on this tactic is to lie in wait until the targeted apartment is temporarily unattended and then change the locks and/or seal the building or apartment unit.
>
> This tactic is practiced by the defendants without regard to the dangers it presents to the occupants, and particularly to the many "latch-key" school age children re-

turning home with no notice or understanding that they have been ousted. Said tactic not only fails to consider the physical danger in which said minor children are placed by literally forcing them to remain unattended on the streets until their parents return, but is also oblivious to the potential danger of denying class members access to their clothing, medicine, money, legal documents and, of course, physical means of shelter.

Amended Complaint ¶¶ 62–63, 65–66.

In *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978), Chief Justice Rehnquist observed that "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Under this analysis, a trespasser obviously cannot claim any reasonable expectation of privacy in premises he is unlawfully occupying. *Id.* Nevertheless, if plaintiffs can prove the acquiescence and toleration that they allege, they are not trespassers and they have a possessory interest that enjoys some degree of legitimacy under New York law. *See* 89 N.Y.Jur.2d, Real Property—Possessory Actions § 70, at 410–411 (1991) ("[I]f one originally enters the premises either with ... permission, or lawfully, he or she is neither an intruder nor a squatter."). Until the City exercises its option to terminate the interest, plaintiffs may have a reasonable expectation of privacy sufficient to require some form of prior notice, particularly if New York confers upon them the legal right to remain until they are afforded such notice. *Compare State v. Dias*, 62 Haw. 52, 609 P.2d 637, 639–40 (1980) (landowner's long-term acquiescence to a trespasser's presence can give the trespasser a cognizable privacy interest) *with Amezquita*, 518 F.2d at 11 (rejecting Fourth Amendment claim of squatters where "nothing in the record suggests that the squatters' entry upon the land was sanctioned in any way by the Commonwealth").

■ While the Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry, *see*

*Wilson v. Arkansas,* —— U.S. ——, ——, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976 (1995) (holding that the "common law knock-and-announce principle forms a part of the Fourth Amendment reasonableness inquiry"), the process required by the Fourth Amendment may vary depending on the nature and purpose of an entry and seizure of property. *See, e.g.,* 3 Wayne R. La Fave, Search and Seizure § 10.1 *et seq.* (2d ed. 1987). Where law enforcement officers seek to enter a house for the purpose of searching for incriminating evidence, anything more than the briefest notice may provide an opportunity to destroy evidence. The purpose of the entry by the City here is not to search and seize, but to retake real property it owns and to remove one who has been occupying it by sufferance. Under these circumstances, prior notice provides an opportunity to preserve privacy and protect property by giving the occupant an opportunity to vacate the premises on her own. Prior notice also serves another significant purpose when the City resorts to self-help. An occupant of an apartment afforded such notice who can demonstrate a lawful right to avoid eviction can seek the kind of judicial review, such as an action to quiet title, that is far more meaningful than an ex parte warrant normally required by the Fourth Amendment. *Cf. Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (holding that a pre-deprivation opportunity to be heard satisfies the Due Process Clause).

In the context of the present case, it is unnecessary to decide if a warrant is required and, if so, whether the notice to quit constitutes an adequate substitute for a warrant. Plaintiffs seek injunctive relief. Their status, whether it be as trespassers or as tenants at sufferance, will be resolved here. Under these circumstances, there would be nothing for a magistrate to decide, because in either case they would have no right to avoid eviction. The only issue is whether they are entitled to reasonable notice. Moreover, because the thirty-day notice to quit provided by N.Y.Real Prop.Law § 228 is reasonable, there is no need to determine whether some lesser period of time or different mode of notice would satisfy the Fourth Amendment here.

The conclusion that the amended complaint states a viable cause of action must be viewed in light of the standard necessary to survive a motion to dismiss, i.e., whether there is any set of facts that, if proved, would entitle plaintiffs to relief. *McLain v. Real Estate Bd.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). In order to prevail, plaintiffs will be required to establish a conscious and deliberate policy decision by the defendants to tolerate and acquiesce in the occupancy of apartments in vacant and partially occupied *in rem* properties by homeless families for residential purposes. The mere failure of the City of New York to maintain continuous vigilance over some 4000 *in rem* properties to determine whether they have been illegally occupied will not suffice. Indeed, even laches by a municipality does not create a presumption of constructive consent. *See, e.g., Village of N. Pelham v. Ohliger,* 216 A.D. 728, 728, 214 N.Y.S. 253 (2d Dep't 1926) (per curiam), *aff'd without op.,* 245 N.Y. 593, 157 N.E. 871 (1927); *Town of Eastchester v. Noble,* 2 Misc.2d 1034, 1036–37, 148 N.Y.S.2d 592 (Sup.Ct.), *aff'd without op.,* 2 A.D.2d 714, 153 N.Y.S.2d 600 (2d Dep't 1956). Nor would toleration of a particular squatter by unauthorized low-level employees entitle plaintiffs to relief, for a City may not be held to the unauthorized acts of its employees. *Hauben v. Goldin,* 74 A.D.2d 804, 426 N.Y.S.2d 273 (1st Dep't 1980) (mem.); *Morley v. Arricale,* 104 A.D.2d 207 (1st Dep't 1984), *aff'd* 66 N.Y.2d 665, 495 N.Y.S.2d 966, 486 N.E.2d 824 (1985).

I turn now to plaintiffs' motion for a preliminary injunction. A preliminary injunction may issue if "the moving party establishes 1) irreparable harm and 2) either a) a likelihood of success on the merits, or b) sufficiently serious questions going to the merits of its claim to make them a fair ground for litigation, plus a balance of hardships tipping decidedly in favor of the moving party." *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

Plaintiffs have succeeded in their second try, following the motion to dismiss

the initial complaint, to frame a complaint that survived a motion to dismiss. Nevertheless, plaintiffs have come forward with little in the way of the kind of evidence of acquiescence and toleration that would suggest either a reasonable likelihood of success or a fair basis for litigation. Indeed, the anecdotal evidence on the public record, if anything, reflects a determined effort by the City "to avoid legitimizing illegal squatting throughout the City," even where it made formal efforts to use foreclosed property for use by the homeless. Eric Hirsh & Peter Wood, *Squatting in New York City: Justification & Strategy*, 16 N.Y.U.Rev.L. & Soc.Change 605, 614 (1988); *see also Morillo v. City of New York*, 178 A.D.2d 7, 582 N.Y.S.2d 387 (1st Dep't 1992) (discussing an HPD procedure, instituted in 1988, that allowed the HPD at its discretion to convert unauthorized occupants into tenants). Similar anecdotal evidence to the contrary is provided by cases involving disputes between the City and squatters spanning the ten-year policy of acquiescence alleged in the amended complaint. Hirsh & Wood, *supra*, at 614 ("[U]ndoubtedly concerned about the precedent that would be set if a massive, well-publicized squatting effort were allowed to continue unimpeded, the City arrested eighteen squatters and their supporters."); *see also De Villar v. City of New York*, 628 F.Supp. 80 (S.D.N.Y.1986) (Leval, J.); *Paulino v. Wright*, 210 A.D.2d 171, 620 N.Y.S.2d 363 (1st Dep't 1994); *Morillo*, 178 A.D.2d at 7, 582 N.Y.S.2d 387; *Almonte v. City of New York*, 166 Misc.2d 376, 636 N.Y.S.2d 261 (Sup.Ct.1995); Shawn G. Kennedy, *Riot Police Remove Thirty–One Squatters From Two East Village Buildings*, N.Y. Times, May 31, 1995, at A1.

▆▆▆▆ Nor is the plaintiff, John Doe, who claims to hold his apartment as an adverse possessor, entitled to injunctive relief. While I assume for present purposes that one may obtain title to an apartment in a City-owned building by adverse possession, plaintiff has failed to provide his name and has denied the defendants an opportunity to test the merits of his claim of adverse possession. Moreover, New York law provides an adverse possessor a remedy by an action to quiet title. N.Y.Real Prop.Acts.Law § 501 *et seq.* Since a pre-deprivation proceeding is sufficient to satisfy the Due Process Clause, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), he is not entitled to injunctive relief.

▆▆▆▆ Although I deny preliminary injunctive relief, I reject the City's claim that, even if the allegations are true, plaintiffs are not entitled to relief. If the facts alleged here can be proved, this case is similar to *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966) (en banc), in which injunctive relief under § 1983 was granted against the defendant Police Commissioner because the wholesale raids in violation of the Fourth Amendment were the "effectuation of a plan conceived by high ranking [police] officials," a practice which in the interim the defendant had "renounced only obliquely, if at all," and as to which "the danger of repetition has not been removed." *Id.* at 202, 204. This case, like *Lankford*, involves an announced policy already in place against a discrete class of persons of which the plaintiffs are members. *See also Build of Buffalo, Inc. v. Sedita*, 441 F.2d 284, 289 (2d Cir.1971) (holding that plaintiffs had stated a claim because "[d]eliberate, purposeful activity resulting in widespread police abuses and perhaps rising to the level of de facto policy were held to be appropriate occasions for injunctive relief in cases such as *Lankford*").[2] The fact that the large number of squatters situated throughout the City makes it impossible to predict which one of the plaintiffs will be next does not require dismissal of the complaint on the ground of ripeness. Indeed, because of the City's unwillingness to pro-

**2.** *Cf. Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (finding no justiciable controversy where plaintiffs' "claim to 'real and immediate' injury rests not upon what the named [defendants] might do in the future ... but upon what a small, unnamed minority of policemen might do to them in the future because of that policeman's perception of departmental disciplinary procedures."). The *Rizzo* Court distinguished the case before it from *Lankford* in a manner that indicated its approval of the decision that an official policy would be sufficient to confer standing. *See id.* at 373 n. 8, 96 S.Ct. at 605 n. 8.

vide prior notice of its intent to resort to self-help against a particular squatter, injunctive relief will never be available, unless it is afforded here, notwithstanding the threatened irreparable injury.

Accordingly, for the foregoing reasons, defendants' motion to dismiss the complaint and plaintiffs' motion for a preliminary injunction are denied.

SO ORDERED.