107 F.3d 985
 65 USLW 2615
 SANITATION AND RECYCLING INDUSTRY, INC., Michael
Dibenedetto, Multi-Carting, Inc., John A. Corrieri, Inc.,
John P. Corrieri, Inc., Victor Ferrante, Silver Star Carting
Co., Inc., Michael Verrilli, Falso Carting Co., Inc.,
Constantino Isabella, Isabella City Carting Corp., Kenneth
Occhiogrosso, Joe's Sanitary Haulage, Vincent Cinotii,
Marangi Carting Corp., John A. Toscano, Mr. T Carting Corp.,
Carl Dell'Olio, Dellvena Carting Corp., John Florio, Pioneer
Carting Corp., James Tesi, C.T. Carting Corp., Angela
Buskirk, Frank Lomangino & Sons, Inc., Arnold Sirico,
Midbronx Haulage Corp., Paul Panza, Bronx County Rubbish
Removal, Inc., Jay Malave, Vincent Archina, Crown Waste,
Inc., Gerald Antonacci, Plaintiffs-Appellants,
v.
CITY OF NEW YORK, Defendant-Appellee.
 No. 655, Docket 96-7788.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 9, 1996.
Decided Feb. 28, 1997.
 
 Gerald Walpin, New York City (Jeffrey L. Braun, Jane J. Ferrall, Jonathan J. Faust, Rosenman & Colin, LLP, New York City, of counsel), for Plaintiffs-Appellants.
 Alan G. Krams, New York City (Paul A. Crotty, Kristin M. Helmers, Corporation Counsel of the City of New York, New York City, of counsel), for Defendant-Appellee.
 Before: NEWMAN, Chief Judge, CARDAMONE, and CALABRESI, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal challenges the constitutionality of Local Law 42, a newly-enacted law of the City of New York, that purports to promote the efficient and lawful conduct of the commercial carting business in the City. Finding that the carting industry has been corruptly influenced by an organized criminal cartel for many years, and that law enforcement and regulation of the industry under existing law has not succeeded in rooting out illegal and anticompetitive practices, the City passed the challenged law. This targeted criminal cartel is a "black hole" in New York City's economic life. Like those dense stars found in the firmament, the cartel can not be seen and its existence can only be shown by its effect on the conduct of those falling within its ambit. Because of its strong gravitational field, no light escapes very far from a "black hole" before it is dragged back, Stephen W. Hawking, A Brief History of Time--From the Big Bang to Black Holes, 81-82 (Bantam Books 1988); the record before us reveals that from the cartel's domination of the commercial waste industry, no carter escapes. Local Law 42 establishes a new commission and regulatory scheme to address this pervasive problem.BACKGROUND
 
 A. The Carting Industry
 
 2
 At least since the turn of the century, New York City has required commercial establishments to hire private carters to collect their refuse. However, the City once made an exception for commercial establishments in residential areas, allowing them to have their garbage picked up by the City free of charge. This exception was eliminated in 1956. For the past 40 years all commercial establishments in New York have been required to contract with private carting companies for the removal and disposal of their waste. Three hundred private carting companies service 250,000 commercial accounts, removing more than 12,000 tons of commercial waste and recyclable materials each day. Most of the carting companies are "mom and pop" businesses, owned by one individual or members of a single family for decades. After private haulers took over commercial carting in residential areas, however, racketeering and anticompetitive conduct commenced almost immediately, and has continued to the present day.
 
 
 3
 The 1987 Rand study of racketeering in legitimate industries, undertaken for the U.S. Department of Justice, described how carters sold each other the exclusive right to service particular customers, while racketeers mediated intercarter disputes. Peter Reuter, Rand Corporation, Racketeering in Legitimate Industries: A Study in the Economics of Intimidation (1987). Customers had no choice in who hauled their trash and were routinely victimized by having the amount of refuse falsely inflated. A 1986 report by the New York State Assembly's Environmental Conservation Committee concluded that organized crime's domination of the waste hauling industry in New York City had become such a functional part of the industry that eliminating it would require even more stringent regulations than the then-existing regulatory scheme. New York State Assembly Environmental Conservation Committee, Organized Crime's Involvement in the Waste Hauling Industry (1986).
 
 
 4
 A joint investigation by the New York City Police Department and the Manhattan District Attorney led to the June 1995 indictment of 17 individuals, 23 carting companies, and four trade associations for their roles in an allegedly broad cartel to restrain competition and artificially inflate carters' prices and profits. According to the indictment, this cartel restrains competition by acts of violence including attempted murder, assault and arson; allocates customers to particular carters and directs substantial compensation in instances when one carter loses a customer to another; and treats carters operating outside the existing trade associations as outlaws, subjecting them to violence and threats if they compete for an established customer of a trade association member.
 
 B. Enactment of Local Law 42
 
 5
 Against this backdrop Local Law 42 was submitted to the City Council, which held three hearings between December 1995 and May 1996 to consider it. The hearing record confirmed a pattern of racketeering and corruption in the New York City carting industry. The Manhattan District Attorney explained to the Council that the private carting industry is "dominated by an organized crime-controlled cartel" that has "reaped staggering economic rewards by preventing any meaningful competition for customers." He estimated that $500 million of the revenue generated in the $1.5 billion-per-year carting industry is cartel-created overcharges. A former director of the New York State Organized Crime Task Force told the City legislators that organized crime controlled the industry by manipulating the companies through the trade waste associations.
 
 
 6
 Local Law 42 was signed into law on June 3, 1996 and took effect immediately. Local Law 42 § 14. It creates a new agency, the New York City Trade Waste Commission (Commission), responsible for the licensing and regulation of the carting business. Administrative Code of the City of New York (Admin.Code) §§ 16-502 & 16-503.[1] The ordinance makes it unlawful for any person to collect trade waste "without a license therefor from the commission," § 16-505(a). Licenses in effect when Local Law 42 was enacted are continued until an unspecified date to be set by Commission rulemaking. Local Law 42 § 14(iii)(a)(2). If a licensee applies for a license renewal within that time, the prior license is valid until a decision is made on the new application. Local Law 42 § 14(iii)(a)(1). A license application must provide information about all of the applicant's principals, § 16-508(a)(i), which include officers, directors, holders of over ten percent of equity, and the relatives of such shareholders in cases where the owner of record is acting on a relative's behalf, § 16-501(d).
 
 
 7
 The Commission may refuse a license "to an applicant who lacks good character, honesty and integrity," although it must state the reasons for a refusal and provide an opportunity to be heard. § 16-509(a). The law provides an illustrative list of relevant factors for the Commission to consider in making a licensing decision, such as pending criminal actions; prior convictions; "knowing association" with convicted racketeers, § 16-509(a)(v), or members of "an organized crime group," § 16-509(a)(vi); and membership in trade associations that have been convicted of specific crimes or where a person holding a position in such trade association is a member of an organized crime group, §§ 16-509(a)(viii), 16-520(j)(i).
 
 
 8
 If warranted by "adverse information" developed in the background investigation, the Commission may condition a license on the carter's retention of an independent auditor or monitor, who would scrutinize the applicant's finances and activities and periodically report them to the Commission. § 16-511. After giving notice and an opportunity to be heard, the Commission is authorized to "revoke or suspend a license" upon certain events, § 16-513, and, under certain circumstances, to suspend a license immediately, subject to "an immediate appeal" and an opportunity for a hearing on an expedited basis, § 16-514.
 
 
 9
 Detailed rules regarding the conduct of the trade waste removal licensees are also established. § 16-520. Licensees must, for example, maintain audited financial statements, records and such other written records as the Commission determines are necessary or useful, § 16-520(c); contracts shall be in a form approved by the Commission, § 16-520(e)(i); and licensees must bill their customers in a form prescribed by the Commission, § 16-520(f). Local Law 42 authorizes the creation of two special trade waste districts if the Commission concludes that improved service and lower prices will result. § 16-523(a), (c). If such districts are created and specific carters are designated to service them, existing carting contracts in those districts are terminated. § 16-524(a).
 
 
 10
 Local Law 42 also regulates hauling contracts, limiting the terms of all private carting contracts to two years, § 16-520(e)(i), and provides that customers whose contracts are assigned by one hauler to another must have an opportunity to terminate the contract within three months after the assignment, § 16-520(e)(i)(i). Transition provisions for existing contracts limit their duration to the date originally provided in the contract or two years from the enactment of Local Law 42, whichever is earlier. Local Law 42 § 11(i).
 
 
 11
 Current contracts are made terminable at will by the carter or customer, with certain exceptions: contracts are not terminable after a carter gets a license and a carter can ask the Commission to waive the termination provisions for particular contracts. Local Law 42 § 11(iii). If the waiver was sought by July 18, 1996, the contract will not become terminable unless the Commission denies the request. The Commission is authorized to "determin[e] in its discretion whether a waiver of the termination requirement would be consistent with the purposes of this act" and is instructed to "consider background information" concerning the business, its principals and the full circumstances surrounding the contract's negotiation. Id.
 
 
 12
 Local Law 42 contains a severability provision pursuant to which if any part of the law is held invalid by any court of competent jurisdiction, the remainder is not affected. Local Law 42 § 8.
 
 C. Prior Proceedings
 
 13
 Plaintiffs began the instant declaratory judgment action in the United States District Court for the Southern District of New York (Pollack, J.) on June 4, 1996, one day after the statute took effect. The complaint alleged that several provisions of Local Law 42 are invalid on their face. Asserting there would be injury to their businesses if the law's challenged provisions were given effect, plaintiffs asked for a preliminary injunction preventing enforcement of those provisions pendente lite. The City cross-moved for summary judgment dismissing the complaint.
 
 
 14
 In granting summary judgment for the City and dismissing plaintiffs' complaint, Judge Pollack found Local Law 42 is not facially invalid because it can be applied constitutionally. He termed the local law "surgery" that was "essential, overdue and carefully tailored to protect the public interest with measured consideration of the interests and welfare of those who strive only for fair business conditions." From this decision, plaintiffs appeal. We affirm.
 
 DISCUSSION
 
 15
 Plaintiffs' attack on Local Law 42 is limited to specific provisions they believe go too far and that are invalid on their face. In particular, plaintiffs contend nine aspects of Local Law 42 violate the Constitution. Provisions of Local Law 42 transgress the Contract Clause (Article I, § 10) by cutting off existing term contracts (1) two years after the law's effective date or by June 3, 1998, (2) at the customer's election in the event of an assignment from one carter to another, (3) at the customer's election in the absence of a waiver from the Commission, and (4) immediately after the Commission's mandated establishment of pilot special districts. The waiver provision violates due process because (5) it establishes no meaningful standard to guide the Commission's exercise of discretion and no provision for notice or a hearing if a waiver is denied; and (6) the independent auditor provision violates due process by authorizing the Commission to require, as a condition to granting a license, that certain licensees, the investigation of which has revealed "adverse information," retain an independent auditor, without providing notice and an opportunity to be heard.
 
 
 16
 The law also impinges impermissibly, plaintiffs continue, on the constitutional guarantee of freedom of association by the restrictions it places (7) on a carter's right to associate with individuals who have been convicted of certain crimes or are associated with groups identified by law enforcement agencies as affiliated with organized crime and (8) on a carter's right to join trade associations. Finally, (9) Local Law 42 violates plaintiffs' rights of privacy by compelling applicants for carting licenses to disclose to the Commission confidential information not related to their carting businesses, and confidential information of family members who have no relationship to their businesses--without requiring the Commission to maintain such information in confidence.
 
 I Impairment of Contract Challenges
 
 17
 Because plaintiffs have chosen to raise their Contract Clause arguments in the context of a facial challenge to the statute, they bear a heavy burden. Younger v. Harris, 401 U.S. 37, 52-53, 91 S.Ct. 746, 754-55, 27 L.Ed.2d 669 (1971). There are only two situations where a court may uphold a facial challenge: when plaintiff can demonstrate that the challenged law "could never be applied in a valid manner," New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988), or when First Amendment rights are at issue, id., a subject we discuss later.
 
 
 18
 Under Section 10 of Article I of the Constitution, no state shall pass any law "impairing the Obligation of Contracts." Although this provision sounds like an absolute prohibition, the Contract Clause must be accommodated to the police power a state exercises to protect its citizens. See Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). Instead of an absolute bar, the Contract Clause is viewed as imposing "some limits upon the power of a State to abridge existing contractual relationships." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 242, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978) (emphasis in original).
 
 
 19
 Those limits on the state's otherwise valid exercise of its police power are determined by a three-part test that asks: (1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate. See Energy Reserves, 459 U.S. at 411-13, 103 S.Ct. at 704-06; Allied Structural Steel, 438 U.S. at 242-44, 98 S.Ct. at 2721-22; United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 22-23, 97 S.Ct. 1505, 1517-18, 52 L.Ed.2d 92 (1977).
 
 
 20
 The first step in the analysis is to determine "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Allied Structural Steel, 438 U.S. at 244, 98 S.Ct. at 2722. The more severe the impairment, the greater the level of scrutiny given it. Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704. The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted. Id. Impairment is greatest where the challenged government legislation was wholly unexpected. When an industry is heavily regulated, regulation of contracts may be foreseeable; thus, when a party purchases a company in an industry that is "already regulated in the particular to which he now objects," that party normally cannot prevail on a Contract Clause challenge. Veix v. Sixth Ward Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940). Also relevant to the determination of the degree of impairment is the extent to which the challenged provision provides for "gradual applicability or grace periods." Allied Structural Steel, 438 U.S. at 247, 98 S.Ct. at 2724.
 
 
 21
 Assuming a contractual relationship has been substantially impaired, the next step is to examine the state's justification for its action. See Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704. The law must have a "legitimate public purpose." Id. It should be aimed at remedying an important "general social or economic problem" rather than "providing a benefit to special interests." Id. at 412, 103 S.Ct. at 705. Sometimes this inquiry must be approached on a provision-by-provision basis--statutes aimed at solving broad societal problems may contain language whose only purpose is to benefit a small interest group. See, e.g., Garris v. Hanover Ins. Co., 630 F.2d 1001, 1009-10 (4th Cir.1980) (statute as a whole had broad general purpose, but challenged provision aimed at benefiting small interest group).
 
 
 22
 If the legislative purpose is valid, the final inquiry is to determine whether the means chosen to achieve that goal are reasonable. U.S. Trust Co., 431 U.S. at 22-23, 97 S.Ct. at 1517-18. A law that works substantial impairment of contractual relations must be specifically tailored to meet the societal ill it is supposedly designed to ameliorate. Allied Structural Steel, 438 U.S. at 243, 98 S.Ct. at 2721-22.
 
 
 23
 We discuss the four Contract Clause challenges in this analytical framework. The plaintiffs contend Local Law 42 violates the Contract Clause by (1) shortening the term of existing carting contracts to a maximum of two years, (2) rendering carting contracts terminable at the customer's option on assignment of such contracts by one carter to another, (3) rendering carting contracts terminable at will unless the carter obtains a new license or applies for a waiver, and (4) terminating immediately all contracts within a pilot district. As noted, plaintiffs' facial attack on Local Law 42 is extraordinarily difficult to mount successfully since they must demonstrate that the law may not be validly applied under any set of circumstances. United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).
 
 
 24
 Plaintiffs point out that a carter who has bargained for a long-term contract will, under the new law, suddenly possess a contract whose term is no longer than two years, and which may in many cases be terminated immediately (in pilot districts and in situations where a waiver is not granted). They think this a dramatic, unforeseen change. The City responds that garbage collection and disposal is a core function of local government, and in New York City has been subject to 40 years of regulation and licensing.
 
 
 25
 Plaintiffs declare, relying on Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383, 385 (8th Cir.1994) (state statute that retroactively alters existing franchising contracts violates Contract Clause), that although the City has for many years regulated the carting industry, it had never regulated with respect to the duration of contracts. Plaintiffs maintain therefore that they had no fair warning of legislative intervention into that area and that its unforeseen advent is a substantial impairment of their constitutional rights. We note that, although the City has never before regulated the duration of carters' contracts, carters have been for decades subject to the City's regulations and may be held to have anticipated regulation of this sort. Yet, we do not think we need decide the precise degree to which these provisions of Local Law 42 impair contractual relationships.
 
 
 26
 We say this because, as Judge Pollack correctly observed, the law has a legitimate purpose. Its aim--eradicating the vestiges of criminal control accompanied by bid-rigging, "evergreen" contracts and predatory pricing in the carting industry--is a broad societal goal, not the pursuit of the interests of a narrow class. The City has broad (though not unlimited) power to enact a law like Local Law 42 to achieve these legitimate ends without worrying that in so doing private contracts may be impaired or even destroyed. See U.S. Trust Co., 431 U.S. at 22, 97 S.Ct. at 1517-18. Otherwise, as Justice Holmes observed, a person whose rights "are subject to state restriction [could] remove them from the power of the State by making a contract about them." Hudson County Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).
 
 
 27
 The ultimate question is whether the City--in enacting Local Law 42--has chosen reasonable means to achieve its legitimate purpose. When reviewing a law that purports to remedy a pervasive economic or social problem, our analysis is carried out with a healthy degree of deference to the legislative body that enacted the measure. U.S. Trust Co., 431 U.S. at 22-23, 97 S.Ct. at 1517-18. If, as the City found, the vast majority of the contracts entered into under the old scheme were tainted by the threat of violence and anticompetitive practices, gradually phasing out those contracts and arranging for new carting contracts to be negotiated in an atmosphere free of coercion is a reasonable accommodation between the impairment of plaintiffs' contracts and the City's exercise of its police power. Further, it is clear that in some cases, e.g., those where the contract is about to expire by its terms, the impairment caused by the law will be slight. We cannot conclude that the statute may not under any circumstances be found constitutional. Thus, plaintiffs' facial attack against Local Law 42 on impairment of contract grounds (points 1-4) can not succeed.
 
 II Due Process Challenges
 
 28
 We turn next to plaintiffs' due process contentions. In this regard, plaintiffs insist in substance that Local Law 42 violates due process in that (5) the waiver provision provides no meaningful standard to inform the Commission's discretion and allows the granting or denying of a license where there is no provision for notice and an opportunity to be heard and (6) the provision permitting the Commission to condition the grant of a license on the appointment of an independent auditor to monitor the activities of the licensee contains neither objective standards nor provides an opportunity for a hearing on the issue.
 
 
 29
 The law renders all contracts held by a carter who has not received a license by July 18, 1996 (no carter met this deadline) terminable at the customer's option on 30 days notice unless the carter obtains from the Commission a waiver of the termination provision with respect to identified contracts. See Local Law 42 § 11(iii). Plaintiffs assert that the contract termination provision, combined with the requirement for obtaining a waiver to avoid termination, violates due process. The first reason advanced is that the standard guiding the Commission's discretion in granting or denying a waiver is so utterly meaningless as to constitute no standard at all.
 
 
 30
 Under Local Law 42 the Commission must determine within its discretion "whether a waiver would be consistent with the purposes of the Act." Local Law 42 § 11(iii). The statute clearly states its purposes--to eliminate corruption and to protect consumers. The statute instructs the Commission to "consider background information" regarding the applicant and its principals and all the circumstances respecting the negotiation and implementation of such contracts, "including but not limited to the form and content thereof." Id.
 
 
 31
 A statute cannot be struck down as unconstitutionally vague unless it is "impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Under this broad standard governing facial challenges to an economic regulation, Local Law 42's recited purposes give the Commission sufficient legislative direction so that Local Law 42 is not impermissibly vague.
 
 
 32
 Plaintiffs next contend that their procedural due process rights may be violated because the statute authorizes the Commission to make its waiver decisions and decisions as to whether to appoint an auditor without an explicit hearing requirement. We note first that plaintiffs' complaint is hypothetical. Although the Act also does not require that the Commission provide waiver applicants with notice and an opportunity to be heard on their applications, the Commission chose to provide each of the 42 applicants who have been denied waivers to date with the Commission staff's recommended decision and an opportunity to respond before the Commission acted. Similarly, while the statute does not require the Commission to provide applicants with process before it conditions the grant of a license on the retention of a monitor or auditor, the Commission may nonetheless do so.
 
 
 33
 Moreover, to succeed on a claim of procedural due process deprivation--that is, a lack of notice and opportunity to be heard--a plaintiff must establish that state action deprived him of a protected property interest. Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). When alleging a property interest in a public benefit, plaintiff must show "a legitimate claim of entitlement" to such interest. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiffs have no property interest in a waiver of the termination of their existing contracts. The parties agree that the local law grants the Commission substantial discretion to decide whether or not to grant a waiver. The existence of that discretion precludes any legitimate claim of entitlement. Hence, no protected property interest in a waiver exists. Absent a property interest, there is no right to a hearing (point 5).
 
 
 34
 Nor have plaintiffs a property right in a possible future license. Again, the Commission is vested with broad discretion to grant or deny a license application, which forecloses plaintiffs from showing an entitlement to one. See Morillo v. City of New York, 178 A.D.2d 7, 13, 582 N.Y.S.2d 387 (1st Dep't), appeal dismissed, 79 N.Y.2d 1039, 584 N.Y.S.2d 448, 594 N.E.2d 942 (1992). Absent this showing, plaintiffs have no protected property interest in a future license--let alone one free of conditions. Having shown no property interest for due process to protect, plaintiffs have suffered no deprivation of their due process rights as a result of the independent auditor provisions (point 6).
 
 III Intimate Associational Rights
 
 35
 We pass now to plaintiffs' challenges to Local Law 42 on the grounds that it unconstitutionally infringes on their right of association (points 7 and 8). The United States Constitution affords protection to two distinct types of association, "intimate association" and "expressive association." Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984); City of Dallas v. Stanglin, 490 U.S. 19, 23-25, 109 S.Ct. 1591, 1594-95, 104 L.Ed.2d 18 (1989). Plaintiffs declare that Local Law 42 impermissibly burdens both kinds of associational freedom. We address the right to intimate association first.
 
 
 36
 That right guarantees an individual the choice of entering an intimate relationship free from undue intrusion by the state. Roberts, 468 U.S. at 617-18, 104 S.Ct. at 3249. At a minimum, it extends to relationships that "attend the creation and sustenance of a family--marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." Id. at 619, 104 S.Ct. at 3250. Whether the right extends to other relationships depends on the extent to which those relationships share the characteristics that set family relationships apart--small, select, and secluded from others. Id. at 620, 104 S.Ct. at 3250-51.
 
 
 37
 Local Law 42 permits the Commission to deny a license if, after notice and opportunity to be heard, the Commission concludes the applicant "lacks good character, honesty and integrity." Admin. Code § 16-509(a). In making this determination, the new law permits, but does not require, the Commission to consider, among other things, the applicant's:
 
 
 38
 (v) ... knowing association with a person who has been convicted for a racketeering activity ...
 
 
 39
 (vi) association with any member or associate of an organized crime group as identified by a federal, state or city law enforcement or investigative agency when the applicant knew or should have known of the organized crime associations of such person.
 
 
 40
 § 16-509(a)(v)-(vi). Plaintiffs insist that these provisions are unconstitutional on their face because they subject a carter to the risk that a license will be denied based on associations that may include family or social relationships.
 
 
 41
 The Constitution does not recognize a generalized right of social association. The right generally will not apply, for example, to business relationships, Roberts, 468 U.S. at 620, 104 S.Ct. at 3251; chance encounters in dance halls, Stanglin, 490 U.S. at 25, 109 S.Ct. at 1595; or paid rendezvous with escorts, IDK Inc. v. County of Clark, 836 F.2d 1185, 1193 (9th Cir.1988). The Constitution does protect the right to intimate association as a "fundamental element of personal liberty," Roberts, 468 U.S. at 618, 104 S.Ct. at 3249, and so there are doubtless relationships that the Commission may not lawfully regulate. We think it plain, however, that pure business relationships with organized crime members fall outside the protected sphere. Local Law 42 goes no further. The statute was not intended to prohibit family associations or social contacts with the persons defined in § 16-509(a)(v)-(vi) when those contacts have nothing to do with the waste disposal business.
 
 
 42
 So interpreted, Local Law 42 may be applied to associations that occur in connection with the waste disposal business without transgressing on the freedom of intimate association. The restriction that only associations or contacts involved with the waste disposal business are suspect adequately protects the statute from claims that it unduly chills intimate associations. Under the circumstances, we do not need to decide whether overbreadth attacks apply to alleged infringements of the right to intimate association as they do to First Amendment rights, or whether overbreadth challenges do not apply because, as several circuits have held, the right to intimate association lies not in the First but in the Fourteenth Amendment. See Griffin v. Strong, 983 F.2d 1544, 1546-47 (10th Cir.1993); Swank v. Smart, 898 F.2d 1247, 1251-52 (7th Cir.1990); IDK, 836 F.2d at 1191-92.
 
 IV Expressive Associational Rights
 
 43
 We pass now to the second type of associational freedom--"expressive association"--which protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances. These are the so-called "political" associational rights. Local Law 42 places significant restrictions on the freedom of carters to associate with others for expressive purposes. The first set of restrictions impacts the personal relationships of carters. Section 16-509(a) permits the Commission to consider--when deciding whether an applicant has the requisite honesty and integrity to receive a license--a carter's knowing association with convicted racketeers or persons whom the carter should have known are associated with groups that have been identified by local authorities as organized crime groups. §§ 16-509(a)(v)-(vi).
 
 
 44
 The second set of restrictions limits the ability of carters to associate together in trade associations. Section 16-520(j)(i) prohibits a carter from belonging to or holding a position in any trade association where the association has violated the antitrust laws or been convicted of racketeering, where a person holding a position in the association has violated the antitrust laws or been convicted of racketeering, where a person holding a position in the association is a member of a group that has been identified by a law enforcement authority as an organized crime group, or where the association has failed to fully cooperate with the Commission in connection with an investigation. §§ 16-520(j)(i)(aa)-(dd). The Commission may permit a licensee to belong to such a trade association if it determines that the association is not operating inconsistently with Local Law 42's purposes. § 16-520(j)(ii). Similarly, § 16-509(a) permits the Commission to consider current membership or holding a position in such trade associations when evaluating the worthiness of a carter to receive a license. §§ 16-509(a)(viii)(ix).
 
 
 45
 Appellants aver that the provisions restricting carters' associational rights target innocent carters who have never been accused of wrongdoing and invite probing into relationships having nothing to do with a carter's business; it is therefore overbroad and will chill their legitimate First Amendment activities. The City counters that freedom of association is protected only from unjustified interference and that rooting out corruption and racketeering is a public interest that justifies regulation of individual carters' associational rights. Because § 16-509(a) focuses only on the particular kinds of criminals largely responsible for the rampant abuses in the carting industry, the City insists Local Law 42 is narrowly drawn to achieve its purpose and could not be more narrowly tailored and still meet these legitimate government objectives.
 
 A. Personal Associational Restrictions
 
 46
 Our analysis turns to plaintiffs' facial challenge to §§ 16-509(a) and 16-520(j) on overbreadth grounds. Striking a portion of a statute on overbreadth grounds is "strong medicine" to be used "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). For an overbreadth challenge to succeed, it must be demonstrated that the government has significantly interfered with the right of individuals to associate together. Lyng v. UAW, 485 U.S. 360, 366-67 & n. 5, 108 S.Ct. 1184, 1189-90 & n. 5, 99 L.Ed.2d 380 (1988). Thus in this case, an overbreadth attack may prevail only if plaintiffs can show that an impermissible risk is created that ideas may be chilled whenever Local Law 42 is applied. See New York State Club Ass'n, 487 U.S. at 11, 108 S.Ct. at 2233.
 
 
 47
 The right of association for expressive purposes is not absolute. Roberts, 468 U.S. at 623, 104 S.Ct. at 3252. Even regulations that substantially infringe upon that right will pass constitutional muster if they serve compelling government interests unrelated to the suppression of ideas and those interests cannot be achieved through less restrictive means. Nevertheless, the City may not choose means to accomplish its goal that unnecessarily restrict protected liberty. Kusper v. Pontikes, 414 U.S. 51, 58-59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973). An infringement of the First Amendment right to expressive association--even if in pursuit of a compelling government objective--is justified only if there is no less restrictive means of achieving that end. "Precision of regulation must be the touchstone" in the First Amendment context. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).
 
 
 48
 We think it beyond question that the government has a compelling interest in combatting crime, corruption and racketeering--evils that eat away at the body politic. This interest extends to the carting industry, United States v. Private Sanitation Indus. Ass'n, 995 F.2d 375, 377-78 (2d Cir.1993), and the statute is not aimed at suppressing ideas.
 
 
 49
 Further, the constitutionality of limitations on an individual's right to associate with those who have been convicted of unlawful activity has been upheld in a variety of contexts, most commonly to prevent a convicted defendant from associating with those who would lead him back into a life of crime. The government may, for instance, impose restrictions "reasonably and necessarily related" to its continuing interest in a wrongdoer's rehabilitation, and in protecting the public from further criminal acts. Birzon v. King, 469 F.2d 1241, 1243 (2d Cir.1972). Restrictions have been upheld in the context of probation, United States v. Albanese, 554 F.2d 543, 546 (2d Cir.1977); civil RICO settlements, Private Sanitation, 995 F.2d at 377-78; and union consent decrees, United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1297 (2d Cir.1991). In Trade Waste Management Ass'n v. Hughey, the Third Circuit upheld a New Jersey statute which prohibited licensees from associating "in the waste disposal business" with unsavory individuals. 780 F.2d 221, 236 (3d Cir.1985).
 
 
 50
 The limitations on personal expressive associational rights contained in §§ 16-509(a)(v) and (vi), if construed literally, raise troublesome First Amendment concerns. Such limitations permit denial of a carting license based on an applicant's "knowing association with a person who has been convicted for a racketeering activity," § 16-509(a)(v), or "association with any member or associate of an organized crime group as identified by a federal, state or city law enforcement agency when the applicant knew or should have known of the organized crime associations of such persons," § 16-509(a)(vi). On their face, these provisions would appear to prohibit even lawful expressive association for purely political purposes having nothing to do with the carting industry. We do not believe such a result was intended. When facing a similar issue in United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 44 F.3d 1091, 1098 (2d Cir.1995), we gave a narrowing construction to an associational prohibition. We do so in this case, too, limiting the restrictions contained in those sections of Local Law 42 to associational conduct occurring in connection with the waste disposal business. The provisions, thus construed, permit the Commission to penalize a carter only for knowing associations, having a connection to the carting business, with (i) persons convicted of racketeering or (ii) those individuals that a carter should know are associated with a group identified by law enforcement as an organized crime group. When an applicant is shown to have knowingly associated with a person of prohibited status, the Commission must satisfy itself that the contact was improper under the City law in order for that associational conduct to serve as a basis for denial of a license. Read that way, Local Law 42 is not so overbroad as to significantly interfere with carters' personal associational rights.
 
 
 51
 B. Prohibition on Joining a Trade Association
 
 
 52
 Local Law 42 further prohibits a licensee from being a member or holding a position in any trade association under the terms of § 16-520(j) and §§ 16-509(a)(viii) and (ix). These sections permit the Commission to consider memberships prohibited by § 16-520(j), just discussed, in deciding whether to grant a license. Because the right to associate is part of the complex of those First Amendment freedoms that undergird our free society, any governmental attempt to limit it is subject to the closest scrutiny. NAACP v. Alabama, 357 U.S. 449, 460-61, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958).
 
 
 53
 Trade associations meet the criteria of expressive group activities protected by the First Amendment. Here, the associations serve lawful purposes; that is, they have an educational function, helping carters comply with complex regulations governing the carting business and perform a lobbying function at the city and state level. We accept, in addition, plaintiffs' argument that only a certain number of those active in the carting industry are "bad apples," and we accept further the findings of a 1986 report to a New York State Assembly Committee, which was submitted to the district court, that many proprietors of these small hauling businesses are "generally hardworking, honest people."
 
 
 54
 But, the associations also operate in illegal ways. The hearings on this local law revealed the associations enforced the cartel's anticompetitive dominance of the waste collection industry. The same 1986 Assembly report stated that no carting firm in New York City "can operate without the approval of organized crime." Hence, even these carters not accused of wrongdoing are aware of the "evergreen" contracts and the other associational rules regarding property rights in their customers' locations. The association members--comprising the vast majority of carters--recognize the trade associations as the fora to resolve disputes regarding customers. It is that complicity which evinces a carter's intent to further the trade waste association's illegal purposes.
 
 
 55
 The Constitution does not permit a blanket prohibition against joining a trade association with both lawful and illegal goals. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-19, 102 S.Ct. 3409, 3428-29, 73 L.Ed.2d 1215 (1982). Nonetheless, tangential legitimate purposes pursued by a trade association whose defining aim, obvious to all involved, is to further an illegal anticompetitive scheme will not shield the association from government action taken to root out the illegal activity. When a trade organization becomes so closely brigaded with illegal activity as to become inseparable from it, the government is justified in withholding benefits based on association with such an organization. See Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 1485, 6 L.Ed.2d 782 (1961); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688-89, 93 L.Ed. 834 (1949).
 
 
 56
 Yet, the withholding of benefits must be grounded in some definite standard. In that connection, we have some concern with that portion of § 16-520(j)(i)(cc) that bars a licensee from membership in a trade association "where a person holding a position in such trade organization ... is a member or associate of an organized crime group" as identified by a law enforcement or investigative agency, that is, where such person is "involved" in organized crime. The scope of this provision is indefinite, far from the required touchstone of precision. To avoid constitutional invalidity, we therefore construe the restrictions imposed in subdivision (cc) of § 16-520(j)(i) as meaning that a licensee may not be a member of a trade association where a licensee knows or should know that a person holding a position in such association has been convicted of being or is a member of an organized crime group. Construing the restriction in this narrowed fashion permits us to conclude that this limited infringement on the right of expressive association is justified by the City's compelling interest in eradicating the criminal cartel's control of the carting industry. See Board of Directors of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 549, 107 S.Ct. 1940, 1947-48, 95 L.Ed.2d 474 (1987).
 
 
 57
 As the Supreme Court made clear in Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945), the near dissolution of a trade association may lawfully be ordered where such association "has undoubtedly been an important instrument of restraint and monopoly [and] may be made such again" and where circumstances make "detection and prevention and punishment for such resumption ... difficult if not impossible." Id. at 428, 65 S.Ct. at 393-94. The City of New York found itself faced with just such a situation. The critical role played by trade associations within the proscribed category in the scheme to restrict competition in the carting industry is abundantly established by the record. And, there is little doubt that, left in place, the trade associations could again undermine competition in ways difficult to detect and punish. Because the City can, under the circumstances here, prohibit a licensee from being a member of a proscribed trade organization, it may, a fortiori, deny a license to an applicant that refuses to sever relations with such an organization.
 
 
 58
 We note that although provisions of Local Law 42 have a direct effect on the ability of carters to associate together in trade unions that have violated the antitrust laws or engaged in racketeering, we do not believe that these restrictions have a "substantial" or "significant" effect on the ability of carters to associate together for lawful purposes. Carters remain free to form and join trade associations that have not engaged in criminal activities. To the extent that the trade associations targeted by the statute had lawful objectives in addition to their unlawful aims, those lawful purposes may be advanced freely by carters through new or different industry associations.
 
 
 59
 After engaging in the closest scrutiny, we believe the challenged provisions, as construed, are narrowly tailored to achieve the compelling governmental interest in terminating 40 years of criminal control of the carting industry in New York City. As a consequence, we hold that the prohibitions against association with trade associations are not unconstitutional on their face.
 
 V Privacy Rights
 
 60
 Plaintiffs' final challenge (9) is that Local Law 42 violates plaintiffs' privacy rights. It does this first by compelling the disclosure of confidential information unrelated to the carting business. The City points out that, of the seven required disclosures appellants challenge, five deal with finances and two with legal matters, most of which are matters of public record. The rest of the requested information is disclosure that the City contends it has a substantial interest in discovering. Second, plaintiffs aver the City violates their privacy rights by defining "applicant" to include family members. The language of the local law makes any person a "principal" of a corporate applicant if the parents, children or grandchildren of that applicant own 10 percent or more of the applicant. Admin. Code §§ 16-501(a) and (d). Plaintiffs complain that the Commission required information not only about individuals associated with the carting business as owners, officers, etc., but also information from relatives, whether such persons are connected to the business or not. The City of New York has confirmed in its brief filed with this Court that the Commission does not regard family members who have no interest in the business as included in the definition of "applicant."
 
 
 61
 This concession would dispose of the challenges to the local law on the privacy grounds raised by the plaintiffs, except for the fact that there is no requirement in § 16-508(b) that allegedly private information be maintained by the Commission in confidence. Because we have no threatened disclosure of such private information presently before us, we need not now decide that issue.
 
 CONCLUSION
 
 62
 The judgment appealed from is for the reasons stated accordingly affirmed.
 
 
 
 [1]
 Most of the new regulatory scheme is established by Local Law 42's § 2, which amends New York City's Administrative Code to add Title 16-A, consisting of § 16-501 through § 16-525, to chapter 1. References in this opinion are to the Administrative Code unless otherwise indicated