**MULLER TOURS, INC., Plaintiff,**

v.

**C. Scott VANDERHOEF, as County Executive of the County of Rockland, The Department of Public Transportation of the County of Rockland, Dr. James J. Yarmus, as Commissioner of the Department of Public Transportation of the County of Rockland and The County of Rockland, Defendants.**

No. 98 Civ. 0406(BDP).

United States District Court,
S.D. New York.

July 9, 1998.

Dennis Lynch, Dorfman Lynch & Knoebel, Nyack, NY, for Plaintiff.

John D. Winter, Sheryl Stoessel, Patterson Belknap Webb & Tyler, New York City, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARKER, District Judge.

Plaintiff Muller Tours, Inc., which provides commuter bus transportation between Rockland County and New York City, commenced this action for damages and an injunction that would, among other things, compel the County of Rockland to submit an application to the New York State Department of Transportation on behalf of Muller Tours for State Transportation Operating Assistance Funds ("STOA Funds"). Plaintiff initially applied for interlocutory relief, which the Court denied on January 29, 1998. After expedited discovery, the Court, on March 30 and 31, 1998, conducted a consolidated hearing on Muller's application for injunctive relief and the trial on the merits. The Court's findings of fact and conclusions of law follow.

### FINDINGS OF FACT

1. Plaintiff Muller Tours ("Muller"), a New York corporation with its principal place of business in Brooklyn, New York, is a transportation company that operates various bus lines providing commuter transportation from Rockland County to New York City, as well as various charter service operations.

2. Rockland County (the "County") is a New York municipal corporation. The County of Rockland Department of Public Transportation (the "DPT") is the public transportation agency for the County and has the primary responsibility for overseeing and maintaining public transportation services within the County.

3. C. Scott Vanderhoef ("Vanderhoef") is the County Executive of the County, a position to which he was re-elected in November 1997. Dr. James J. Yarmus ("Yarmus") is the Commissioner of the DPT.

4. The Transportation Law of the State of New York provides for a "state-wide mass transportation operating assistance program

... for the purpose of making payments toward the operating expenses of public transportation systems." N.Y. Trans. Law § 18–b (McKinney 1994). The purpose of the program is to provide safe, efficient, effective, and continuing public transportation services to the residents of the State of New York and to increase the utilization of mass transit facilities as a means of reducing energy demands, traffic congestion, and air pollution. *Id.*

5. Application for STOA funds can only be made by a public transportation system, which would then disburse the funds among the private carriers on whose behalf application was made. The amount of STOA funds that can be paid each year is limited by the annual appropriation levels established by the State legislature.

6. Within Rockland County, the County and the DPT are the governmental bodies granted the exclusive authority by the State of New York to apply on behalf of carriers providing mass transportation services such as Muller for STOA funds made available under the New York State Transportation Law and applicable regulations. In 1995, 1996, and 1997, Rockland County distributed in excess of $5 million in STOA funds each year.

7. A county has broad discretion in determining whether to sponsor applicants for STOA funds. However, the County remains accountable to the State for the use of STOA funds and may be penalized for failure to comply with the rules and regulations governing use of STOA funds.

8. One of the criteria for receipt of STOA funds, under the State Department of Transportation regulations, is that the approved transportation services not duplicate already existing services. The State Department of Transportation discourages STOA applications for duplicative services.

9. STOA assistance has been provided to carriers in the County since the early 1980s. These operators include: (i) Red and Tan Lines, which operated for 50 years before receiving STOA funds; (ii) Shortline Lines, which operated for over 50 years before receiving STOA funds; and (iii) Monsey Trails, which operated for 10 years before receiving STOA funds. These operators have provided satisfactory service to the citizens of the County.

10. In November 1996, Paul Muller, president of Muller met with the County's Transit Administrator, Michael Gurski, and advised him that Muller was planning to operate commuter service in Rockland County and intended to seek STOA funds to subsidize its service.

11. Thereafter, Muller submitted a business plan to the County in support of its application for STOA funds. Muller's areas of operations were located primarily in Monsey, and were, in important respects, duplicative of the existing operations of Monsey Trails.

12. On November 20, 1996, Mr. Gurski advised Muller that the County had not yet made a decision on a course of action and that Muller could begin operations in the County at "[its] own risk" without "any endorsement from the County." Mr. Gurski's letter further stated, "I have not made, nor implied, in any way that you shall or will receive STOA for this service." After receiving this notice, Muller commenced operations in Rockland County in December 1996.

13. On December 31, 1996, the County advised Muller about various problems with Muller's STOA application. Specifically, Muller had indicated in its application that it had a "satellite" storage maintenance facility under a lease with Leisure Lines in Mahwah, New Jersey. The County learned that this assertion was untrue and informed Muller that this problem had to be rectified. The lack of a storage facility was an important issue to the County, which was concerned that without local storage facilities, Muller would store its buses along public roadways, thereby creating safety hazards

14. The County also was concerned about the duplicative nature of the services Muller was providing. Notwithstanding Muller's claim that its services were unique, the County determined that Muller's routes directly competed with existing operators, principally Monsey Trails. In addition, the County's analysis indicated that Muller's ap-

plication appeared to overstate its expected ridership. Thus, the County requested clarification and information from Muller regarding its market surveys and the techniques it used to estimate its ridership figures.

15. Finally, the County told Muller that after it submitted a new business plan with the information requested, and after Muller had been operating for a substantial period of time without free or heavily discounted fares, the County would reevaluate Muller's request for STOA funds.

16. In March 1997 Muller submitted a second business plan. This plan proposed that Muller would operate in three areas: (a) Monsey, (b) Airmont, and (c) the Hamlet. To assist in the evaluation of Muller's second application and help develop written guidelines for future applications, the County retained an independent consultant, Abrams–Cherwony & Associates ("Abrams"). Abrams instructed the County as to what surveys should be conducted to determine if there was a need for Muller's services and what types of information the County should request from Muller to complete its evaluation. In particular, Abrams suggested that the County conduct two ridership surveys in early April. For each survey, Abrams prepared suggested survey forms and explained appropriate survey techniques.

17. Abrams also suggested that the County request from Muller: (1) daily ridership counts from the inception of service for the routes operated including a separate listing by day of the number of boarding passengers; (2) a copy of Muller's operating authority for providing commuter service in Rockland County; (3) a copy of Muller's operating authority for services in New York City; (4) a copy of Muller's storage facility lease; (5) a copy of Muller's driver training program, including provisions for random drug testing; (6) a copy of Muller's vehicle liability insurance provisions; (7) additional support for Muller's claim that there is no duplication with existing services; (8) passenger survey information indicating the extent to which passengers are new riders, rather than those diverted from existing services; and (9) an income and balance sheet for 1996.

18. On April 8, 1997, following Abrams' advice, the County asked Muller to submit additional information in support of its STOA application. The April 8 letter stated that this additional information had to be received and incorporated into the analysis of Muller's application before the County could approve or disapprove Muller's request. Muller objected to the request, but proceeded to submit some of the requested information.

19. Abrams' and the County's review of Muller's additional materials led to the conclusion that Muller was in direct competition with existing carriers. Moreover, the County remained concerned about Muller's supposed operating authority and vehicle registrations. Thus, on June 20, 1997, Muller was advised that the County could not support its STOA application.

20. The County explained to Muller that its STOA application was deficient because: (1) Muller lacked proper operating authority from the Federal Highway Authority ("FHWA") for certain segments of its services; (2) Muller did not have proper bus stop permits or authority to operate in New York City; and (3) Muller did not have the proper vehicle registration for operating in New York. In addition, the County's first-hand observations called into question the accuracy of the ridership figures Muller had submitted to demonstrate a need for its services. Finally, the County reiterated its concern over the duplicative nature of the Muller's "Monsey" and "Airmont" services. The County indicated, however, that Muller's "Hamlet" services were not duplicative of any existing carrier's operations.

21. On July 28, 1997, Muller submitted another revised STOA application. The County remained concerned, however, about Muller's operating authority and duplicative services. Consequently, on August 22, 1997, the County notified Muller that it was requesting advice from other government entities regarding representations Muller made in its amended STOA application that: (a) it had the proper operating authority to operate its routes; and (b) duplicative services were not an issue. The August 22 letter also raised questions about proper route designa-

tions, records storage and reporting requirements that had to be resolved before a contract could be finalized.

22. One month later, the County received comments from the State DOT regarding Muller's application. In a September 23, 1997 letter, which Muller also received, the DOT advised the County that:

Before Muller Tours can receive STOA, a decision must be made by Rockland County to sponsor Muller Tours. Since the beginning of the STOA program, the Department of Transportation has strongly encouraged counties not to sponsor duplicative services and to consider the effect of sponsoring new services on their existing services. In addition, as the amount of STOA that can be paid out in any given year is limited by annual appropriation levels, the State relies on the good judgment of municipalities in the decision whether to sponsor additional services for STOA. Absent reasonable restraint and good judgment by the sponsoring municipalities, there is a real risk that there will be insufficient STOA funds to pay the existing operators their full formula earnings. For these reasons, we do not view STOA as an entitlement that any operator is free to demand of a county. We expect that the county will decide whether sponsoring an operator will result in a good use of public funds and an overall improvement in the county's transportation system.

23. On September 29, 1997, the County advised Muller that it had received guidance from the DOT but was still waiting for a response from the FHWA. The County further advised Muller that "once we have incorporated NYSDOT's guidance and have received a response from FHWA, we will make our decision whether to sponsor Muller, Inc."

24. On September 2, 1997, the County received correspondence from a representative of bus service carriers opposing Muller's receipt of STOA funds. The owners of the local carriers opposing Muller's receipt of STOA funds were politically prominent and had contributed to Vanderhoef's re-election campaign. Consequently, the County did not sponsor Muller for STOA funds.

25. On October 6, 1997 Muller indicated that it would publicize what it viewed as the defendants' failure to sponsor Muller for STOA funds on the basis of pressure from contributors to Vanderhoef's political campaign. Specifically, Muller stated that it would publish an "open letter" advising voters to "vote no for Vanderhoef and yes for Rockland Commuters."

26. A draft of the proposed open letter was highly critical of Vanderhoef. The open letter began: "We, the representatives of concerned citizens of Rockland County, wish to inform Rockland Voters of C. Scott Vanderhoef's failure to fulfill his promise to Rockland County. Mr. Vanderhoef committed to improving the transportation services in the County. He has not only failed to do so, but he has done so with some irregularities." After discussing the alleged irregularities in the County's selection of commuter bus carriers for STOA funds, and the County's failure to sponsor Muller, the letter goes on to state: "So why doesn't Vanderhoef sponsor Muller? Could it be the voting blocks? Could it be the relationship with those companies receiving multi-year unsolicited contracts? Could it be campaign contributions? What ever it is [sic] we plan to stop it!"

27. Immediately thereafter, a County representative contacted Muller and suggested that it make a contribution that would be directed toward the re-election campaign of Vanderhoef. Muller made the contribution.

28. After Muller made the campaign contribution, Yarmus held a special meeting with Muller to discuss the status of Muller's application for STOA funds. As a result of that meeting and the campaign contribution made by Muller, Yarmus sent a memorandum, dated October 21, 1997, to Vanderhoef recommending that the County sponsor Muller's application for STOA funds, and that Muller begin receiving such funds effective November 10, 1997, six days after the election. On October 30, 1997, Yarmus informed counsel to Muller that its approval was practically assured and that there was a "one in a billion chance" that the application would be denied.

29. A few days later, the County received communications from other private bus oper-

ators, certain of whom apparently had contributed to Vanderhoef's campaign, objecting to Muller's receipt of STOA funds. These carriers, who had received a portion of $5 million in STOA funds distributed by the County while Muller's application was pending in 1997, stood to receive less money if Muller's application for STOA funds were approved.

30. Because of licensing and route duplication issues, and in part as a result of opposition by carriers who were donors to Vanderhoef's re-election campaign, the defendants decided after October 30, 1997, not to recommend Muller for STOA funds. That decision, however, was not immediately revealed to representatives of Muller, who believed that the approval of Muller's application was imminent.

31. The County did not make known any final action on Muller's application until after the close of business on Election Day, November 4, 1997, at which time the defendants delivered to Muller a notice that its application for sponsorship for STOA funds had been denied.

32. Notwithstanding the County's proffered reasons for declining to sponsor Muller for STOA funds, a factor in the County's decision was the opposition of current private bus service providers whose owners were supporters of local elected officials.

33. Muller responded to the Election Day denial by letters dated November 7, 1997 and November 18, 1997. The safety issues relied upon to justify the November 4 denial of STOA sponsorship were remedied. However, the County refused to reconsider Muller's request for STOA sponsorship on the basis of the record as it stood at that time.

34. On November 25, 1997, County representatives met with Muller to discuss the reasons why Muller's application was denied. During this meeting, Muller was shown photographic proof that its explanations for improper registrations and insurance were inaccurate.

35. By letter dated December 16, 1997 the County notified Muller that effective January 1, 1998, the DOT would review applications and re-applications for sponsorship for STOA funds pursuant to criteria set forth in new guidelines.

36. On December 18, 1997, Muller was advised that the County would not change its position regarding its denial of Muller's STOA application. Among the many reasons given for this decision were: (i) Muller's failure to adequately explain its use of an invalid license plate after the plate was allegedly surrendered; (ii) Muller's explanation that a mechanic could have forgotten to put the right license plates on a bus; and (iii) a December 15, 1997 letter from the New Jersey Department of Transportation ("NJDOT") stating that Muller's vehicle registration was being suspended. The County advised Muller that if it rectified the deficiencies in its operations, it could reapply for STOA funds. To date, Muller has not reapplied.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction of this case under 28 U.S.C. § 1331.

2. To succeed on a claim for a Due Process violation, a plaintiff must show that: (1) it has a constitutionally protected life, liberty or property interest of which it has been deprived, *Sanitation and Recycling Indus. v. City of New York*, 107 F.3d 985, 994 (2d Cir.1997); *Bross v. Turnage*, 889 F.2d 1256, 1257 (2d Cir.1989), and (2) that it was deprived of that interest without due process of law. *X–Men Security, Inc. v. Pataki*, 983 F.Supp. 101 (E.D.N.Y.1997); *Greene v. Town of Blooming Grove*, 935 F.2d 507 (2d Cir. 1991).

3. To establish a property interest in some form of benefit, a person or entity must have more than a unilateral expectation of it. *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Rather, it must have a "legitimate claim of clear entitlement to it." *Id.*

4. Courts have assessed whether a plaintiff has a clear entitlement to a permit or some other benefit by focusing primarily on the degree of discretion enjoyed by the issuing authority, rather than on the likelihood that the authority will make a specific decision. *Crowley v. Courville*, 76 F.3d 47, 52

(2d Cir.1996); *see also Colson v. Sillman*, 35 F.3d 106, 108 (2d Cir.1994).

5. A clear entitlement exists only when "the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 192 (2d Cir.1994). Thus, when the relevant authority has broad discretion in its decision-making process, no property interest or entitlement will be found. *See Sanitation and Recycling Indus.*, 107 F.3d at 994; *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 919 (2d Cir.1989); *Dean Tarry Corp. v. Friedlander*, 826 F.2d 210, 213 (2d Cir.1987).

6. Applying the above standards, Muller has no "claim of clear entitlement" to receive STOA sponsorship, and therefore no protected property interest, because the County is vested with broad discretion to decide whether to sponsor particular carriers for STOA funds. *Cf. Matter of Alert Coach Lines v. White*, 138 A.D.2d 879, 526 N.Y.S.2d 256 (3d Dep't 1988).

7. The County's August 22, 1997 letter did not create an entitlement to STOA sponsorship for Muller. While the letter does state that the County would forward STOA approval for Muller to the State DOT, it expressly says that certain conditions had to be met before that was done. In this regard, the County told Muller that approval would be given only if representations Muller made in its application were verified or "the additional/more specific authority [Muller Tours] stated it was applying for is received." The letter goes on to discuss the insurance, registration and operating requirements that would have to be satisfied—once Muller's application was approved before a contract could be finalized.

8. Muller's Due Process claim also fails because it had an adequate post-deprivation remedy available to it in the form of an Article 78 proceeding. *see Smith v. O'Connor*, 901 F.Supp. 644, 647 (S.D.N.Y.1995) (no due process violation where New York law provided adequate remedy for property deprivation). Article 78 provides for a proceeding to determine "whether a determination was made in violation of lawful procedure, . . . or was arbitrary or capricious or an abuse of discretion." N.Y.Civ.Prac.L. & R. 7803 (McKinney 1989).

9. A party's failure to avail itself of an Article 78 proceeding precludes a subsequent Due Process claim. *East Coast Novelty Co. v. City of New York*, 781 F.Supp. 999, 1007 (S.D.N.Y.1992) (dismissing due process claim because plaintiffs failed to avail themselves of Article 78 proceeding after seizure of their property); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987) (same); *see also X–Men Sec.*, 983 F.Supp. at 103 ("[t]he availability of an Article 78 proceeding in state court in which plaintiffs could challenge the award of the contract provides a meaningful post-deprivation remedy").

10. The Fourteenth Amendment to the United States Constitution guarantees to every "person" the "equal protection of the laws." U.S. CONST. amend. XIV. Governmental conduct not conceivably rationally related to a legitimate governmental purpose violates Equal Protection. *See Exxon Corporation v. Eagerton*, 462 U.S. 176, 195–196, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983) (governmental classification must be rationally related to legitimate state purpose); *Diederich v. County of Rockland*, No. 97 Civ. 1385(BDP), 999 F.Supp. 568, 572 (S.D.N.Y. 1998) (same).

11. The "equal protection clause is essentially a direction that all persons similarly situated should be treated alike." *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir.1988) (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)) (internal quotations omitted).

12. A validly organized and existing corporation is a person under the Fourteenth Amendment and is entitled to Equal Protection. *Metropolitan Life Ins. Company v. Ward*, 470 U.S. 869, 881, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Merco Properties, Inc. v. Guggenheimer*, 395 F.Supp. 1322, 1325 (S.D.N.Y.1975).

13. An Equal Protection claim may be based on selective enforcement of a gov-

ernmental policy or program when, compared to others similarly situated, the person is selectively treated on the basis of impermissible considerations or due to a malicious or bad faith intent to injure. *Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996); *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995) (citations omitted); *LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994); *Brady v. Town of Colchester,* 863 F.2d at 216; *X–Men Security, Inc. v. Pataki,* 983 F.Supp. 101, 112 (E.D.N.Y.1997).

 14. To succeed on a claim for a violation of the Equal Protection Clause, Muller must show: (1) that it, compared to others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race or religion, intent to inhibit or punish the exercise of constitutional rights or a malicious or bad faith intent to injure. *Crowley,* 76 F.3d at 52.

15. Muller has not demonstrated that it is similarly situated to other STOA applicants who were sponsored by the County for STOA funds.

16. Muller's Equal Protection claim also fails because it did not prove that the defendants' selective treatment of Muller was based on an impermissible motive. *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir. 1995).

17. The County's denial of Muller's application for STOA sponsorship was not based on Muller's membership in any suspect class, nor did the denial reflect an intent to suppress or punish the exercise of a constitutionally protected right.

18. Muller must, therefore, show that the County's denial of its STOA application represented a malicious or bad faith intent to injure.

19. Muller has not shown that the Count's denial of its application for STOA sponsorship amount to a malicious or bad faith intent to injure.

20. In addition, there was a rational basis for the County's denial of Muller's application. *See also Furst v. New York City Transit Authority,* 631 F.Supp. 1331 (E.D.N.Y. 1986) (a challenged policy that does not disadvantage a suspect class and does not interfere with fundamental rights survives scrutiny if policy is rationally related to legitimate state purpose).

 21. The defendants' denial of Muller's application due in part to pressure from political factions, as well as defendants' attempt to condition sponsorship of Muller's STOA application on its political activities are not sufficient evidence of bad faith intent to injure as to amount to a violation of Equal Protection.

### CONCLUSION

For the reasons stated, plaintiff's application for injunctive relief is denied and its claims pursuant to 42 U.S.C. § 1983 are dismissed. The Clerk of the Court is directed to enter judgment in favor of the defendants.

**SO ORDERED:**